[Civ. No. 24920. Second Dist., Div. One. June 26, 1961.]

EUGENE M. GENTRY et al., Respondents, v. KELLEY KAR COMPANY (a Corporation), Appellant.

R. F. Neuman and Allan M. Carson for Appellant.

James L. Garcia for Respondents.

WOOD, P. J.—Plaintiffs Eugene and Ruth Gentry sought (1) damages for fraud in inducing them to execute a lease of an automobile, (2) damages for violation of section 2982, subdivision (a), of the Civil Code (failure to recite certain items in a conditional sale contract of an automobile, and failure to deliver a copy of the contract at the time of its execution), and (3) damages for a violation of section 2982, subdivision (c), of the Civil Code (limiting the amount of the time price differential under a conditional sale contract of an automobile). They also sought (1) to cancel the lease and a chattel mortgage and (2) to quiet title to the automobile and to the furniture referred to in the mortgage.

Plaintiffs George and Jessie Gentry (parents of Eugene Gentry) sought (1) to cancel a trust deed (executed by them as security for the lease) on the ground of fraud in inducing them to execute the deed; and (2) to quiet title to the property referred to in the deed.

Defendant, in its answer, denied the allegations regarding fraud and violations of the code sections, and they alleged that the causes of action were barred by section 340, subdivision 1, of the Code of Civil Procedure. In a counterclaim defendant sought to offset against plaintiffs' demands the depreciation in the value of the automobile resulting from its use by plaintiffs for a period of 17 months.

The court found that defendant falsely represented, as follows: That it would sell the Chevrolet automobile to Eugene and Ruth for the total purchase price of $2,570. That the monthly payments would be $76. That the purchase price included 1957 and 1958 license plates and "full coverage" insurance. That if plaintiffs Eugene and Ruth Gentry would "execute" certain documents (work sheet, leasing agreement, amendment to leasing agreement, and chattel mortgage), and if plaintiffs George and Jessie Gentry would execute the trust deed, defendant would "release" the chattel mortgage and trust deed when Eugene and Ruth had paid $1,300 "on the transaction" and defendant would "give plaintiffs a Conditional Sales Contract" covering said purchase.

There was also a finding that plaintiffs relied upon such representations.

The court also found that the lease was a conditional sale contract of an automobile and that the lease and other documents violated provisions of section 2982 of the Civil Code in that they were not prepared or delivered by defendant as required by said section, and that the lease and other documents violated the provisions of subdivision (c) of section 2982 of the Civil Code in that the amount payable under the lease exceeded the amount of the time price differential allowable under that subdivision.

The court also found that plaintiffs' causes of action were not barred by subdivision 1 of section 340 of the Code of Civil Procedure; that plaintiffs were damaged in the amount of $1,639; that plaintiffs were entitled to punitive damages in the amount of $750; and that defendant was not entitled to an offset against plaintiffs' demands.

The judgment was that the lease, chattel mortgage, and trust deed are void; that defendant had no interest in the furniture referred to in the chattel mortgage, and had no interest in the real property referred to in the trust deed; that Eugene and Ruth Gentry recover from defendant $1,639 general damages and $750 punitive damages; and that defendant take nothing by its counterclaim.

Defendant appeals from the judgment.

Appellant contends that the evidence does not support the findings referred to above.

About April 7, 1957, plaintiffs Eugene and Ruth Gentry went to the place of business of defendant Kelley Kar Company, and Eugene told a salesman there that he wanted to trade his automobile (1951 Chrysler) in connection with the purchase of another automobile. After the salesman showed them several automobiles, they returned to their home and discussed the matter. On April 9 they returned to defendant's place of business and selected a 1956 Chevrolet automobile. At that time they were accompanied by George and Jessie Gentry. From information furnished by Eugene, the salesman prepared a credit application. Eugene and Ruth signed the application, and Eugene gave a check for $25 as "down faith money." On April 10 the salesman told Eugene by telephone that the Chrysler automobile was not a sufficient down payment, that Eugene's credit was good, that the defendant company had arranged to obtain a loan for Eugene from the Imperial Thrift Company, and that Eugene's parents would have to cosign with Eugene and Ruth in order to purchase the automobile. On April 12 the four plaintiffs returned to defendant's place of business, and Eugene and Ruth signed and delivered certain documents to defendant. Those documents were as follows: a work sheet; a paper entitled, "Automobile Leasing Agreement"; a paper entitled, "Amendment to Automobile Leasing Agreement"; and a chattel mortgage. On that same day George and Jessie executed a trust deed as security for the lease. Also on that day, Eugene endorsed a $550 check, which he had received from the Imperial Thrift Company in return for a chattel mortgage on furniture. He delivered the check to defendant. Eugene and Ruth transferred to defendant their interest in the Chrysler automobile and took possession of the Chevrolet automobile. Defendant placed a dealer's notice of sale on the window of the Chevrolet automobile. The notice was on a printed form entitled, "Purchaser's Temporary Operating Copy." The names "Eugene and Ruth Gentry" appeared thereon after the printed words, "Name of Purchaser," and the signature of Eugene appeared after the printed words, "Signature of Purchaser." About April 25, Eugene and Ruth received a policy of automobile insurance which had been obtained by defendant. In that policy, Eugene, Ruth, and Les Kelley Leasing Company were insured against loss of or

damage to the Chevrolet automobile for two years. It was stated therein that the automobile was purchased in April 1957, and that the cost was $2,345. The policy did not include coverage for public liability or property damage. The amount of the premium, as shown thereon, was $118. (It is to be noted that the work sheet stated that the insurance would include public liability and property damage, and that the premium would be $248.)

Subsequent to April 12, 1957, and prior to September 6, 1958, Eugene and Ruth paid $1,064 to defendant in monthly installments. On the date last mentioned, an attorney for plaintiffs notified defendant by letter that plaintiffs intended to rescind all documents executed by them in connection with the transaction and that plaintiffs offered to restore everything of value which they had received from defendant, and that said offer was made upon condition that defendant restore the consideration which it had received from plaintiffs. On September 6, 1958, plaintiffs commenced this action. On November 19, 1958, Eugene returned the Chevrolet automobile to defendant. On November 20 Kelley Finance Company sent to Eugene a "Notice of Intent to Sell Repossessed Motor Vehicle." In that notice the company stated that "Default having been made under the terms and conditions of . . . [the lease agreement], and Seller having repossessed said motor vehicle," notice was given that the company intended to sell the motor vehicle after the expiration of 7 days. It was also stated therein that Eugene might redeem the motor vehicle at any time prior to the sale upon the payment in full of the indebtedness evidenced "by said contract."

The work sheet, above referred to, specified that: the "value" of the Chevrolet automobile, including accessories, was $2,488; taxes were $93.80; registration, transfer, and license fees (licenses for two years) were $50. The work sheet also stated there was a "Deficit" of $527.55. (The deficit was computed by charging Eugene and Ruth $727.55, which was payable to a finance company on the Chrysler automobile, and by crediting them with $175 for their equity in the Chrysler and by crediting them with $25 which they had paid.) The work sheet also stated that charges for insurance and automobile club membership were $272; and that "Charges" were $1,061.65. The "Total of Payments," as shown by the work sheet, was $4,350, and that amount was payable as follows: one payment of $550 on April 16, 1957, and "50 Monthly Notes of $76 beginning May 24th 1957."

The "Auto Leasing Agreement" provided that "Les Kelley Leasing," as "Lessor," leased the automobile to the "Lessee" (Eugene and Ruth) for an initial term of 6 months, that unless the lease was terminated in the manner therein provided at the end of said initial period, it should automatically be renewed for successive terms of one month each, but not to exceed 24 months "from the date of commencement"; that lessee had the right to terminate the lease at the end of the initial term (6 months) and at the end of any succeeding term (1 month) upon 30 days' written notice, and that lessor had the same rights with respect to terminating the lease.

Paragraph 2 of the agreement provided: "Lessee agrees to pay to Lessor *as rental* for use of said vehicle(s) the following sums: For the first month of this lease $266.00, and for each month of this lease thereafter an amount which shall be $12.64 less than the rent for the preceding month, plus 2 cents per mile in excess of 2,000 miles per month, payable upon the expiration or earlier termination of this lease. . . ." (Italics added.) Said paragraph provided further, in part, that the rental included the following insurance coverages: fire, theft, $100 deductible collision, public liability and property damages in limits of $5,000-$10,000-$50,000, and that the rental included automobile club membership.

Paragraph 3 of the agreement provided: *"On Account of the rental* provided for in Paragraph 2, Lessee agrees to pay Lessor $550.00 on the 16th day of April, 1957 . . . $76.00 per month for 1 month beginning May 24th 1957, and $76.00 on the 24th day of each month thereafter until termination of this lease . . . *and upon such termination the unpaid balance,* if any, of the rental provided in Paragraph 2 shall be due and *shall be paid by Lessee in one lump sum."* (Italics added.)

The agreement provided further that lessee agreed to furnish "as security on any monies due under the lease: Chattel on furniture located at: 2902 W. 12th St. L.A. Calif. Trust Deed on property located at: 711 E. 80th St. L.A. Calif. and upon payment of all money due under this contract such items used for security are to be released and returned to Lessee." The agreement provided further, as follows: "It is expressly understood and agreed that this is a contract of leasing ONLY and that the Lessee has by these presents acquired no right, title or interest in or to the Leased Vehicle above described. . . ."

The amendment to the leasing agreement provided that "Subject to all other terms" of the lease, Lessee was granted

an option to purchase the automobile "at the end of the initial term thereof, or termination at any time before final termination, provided Lessee has paid all rental due under said lease and is not otherwise in default, for cash in the amount of the retail Blue Book value at the date of any such termination, or should said lease continue to be renewed for the maximum number of months provided thereunder upon final termination for the sum of $1300.00 . . . cash, payable on or before the date of final termination, or for the sum of $1435.00 payable in installments of $76.00 per month on the 24th day of each month following the date of final termination until paid in full. In the event this option is exercised by Lessee, unless payment of the purchase price is made in cash as above provided, Lessee shall execute a conditional sales contract in form satisfactory to Lessor providing for purchase of said vehicle(s) by Lessee for the installment price and in the installments above set forth."

The chattel mortgage provided that Eugene and Ruth mortgaged to the Kelley Finance Company certain furniture described therein "as security for the payment to Mortgagee of $4,350 being the contract balance due on that certain Automobile Leasing Agreement hereinafter described, and the full and faithful performance of all terms and conditions and promises by said Mortgagor contained in a certain Automobile Leasing Agreement dated the 12th of April, 1957, by and between KELLEY FINANCE Co. . . . as Seller, and Eugene M. Gentry and Ruth Gentry . . . as Purchaser, covering the sale and purchase" of the Chevrolet automobile.

The trust deed named George and Jessie as trustors, and "Kelley Kar Company, a corporation, dba Les Kelley Leasing Company," as beneficiary. It provided: "This Deed of Trust is given as additional security for the obligation of Eugene Gentry and Ruth Gentry, under that certain Automobile Leasing Agreement, covering motor vehicles being leased from the Beneficiary herein." It also provided that the trust deed was given "For the purpose of securing: 1. Performance of each agreement of Trustor incorporated by reference or contained herein. 2. Payment of the indebtedness evidenced by one Automobile Leasing Agreement of even date herewith, and any extension or renewal thereof, in the principal sum of $4350.00 executed by Trustor in favor of Beneficiary or order."

Eugene Gentry testified as follows: The salesman told him that the purchase price of the Chevrolet automobile was

$2,500 "on credit." On April 9 the salesman repeated that statement and also said that the Chrysler automobile would be an adequate down payment on the purchase of the Chevrolet automobile, and that the monthly payments would be $76. On April 12 he signed a "group" of "blank papers," and at that time he also signed the work sheet which was then "completely filled out." He did not know whether the leasing agreement was "filled out" before he signed it. He was not told that he was leasing the automobile, and he was not told that defendant "could not accept a proposal to sell the 1956 Chevrolet" to him on the proposed terms set forth in the work sheet. He was told by the representative of defendant that one of the papers he signed was a paper stating that when he had paid $1,300 "into the car" his parents' home would be released, and that defendant would pay for the 1957 and 1958 license plates for the automobile.

Eugene Gentry testified further that when he signed said documents on April 12, he was not given a copy of any of the documents; that approximately two weeks later he received, by mail, a copy of the leasing agreement, a copy of the amendment to that agreement, and a copy of the work sheet.

George Gentry testified that the salesman told him that when Eugene had paid $1,300 his (witness') property would be released.

Robert Kelley, called as a witness by defendant, testified that he was credit manager of defendant on April 12, 1957; on that date he explained the leasing plan to Eugene and Ruth; thereafter he prepared the lease agreement, and Eugene and Ruth signed it.

Mr. Welborne, called as a witness by defendant, testified that on April 12, 1957, he was sales manager for defendant; on that date Robert Kelley presented the work sheet to him; he "turned the deal down from the standpoint of a conditional sales contract"; he signed the lease agreement upon behalf of defendant and at that time he delivered to Eugene and Ruth a copy of the work sheet, a copy of the lease agreement, and a copy of the amendment to the lease agreement.

■ Appellant contends that the evidence is insufficient to support the judgment upon the basis of fraud or upon the basis of a violation of section 2982 of the Civil Code.

Appellant argues that the difference, if any, between the terms of the transaction (as allegedly represented by its employees) and the terms of the leasing agreement does not amount to fraud; and that the difference in the terms and form

of "the" automobile leasing agreement and terms of "a straight conditional sale contract," if any, is to the advantage of the purchaser. There are substantial differences between the terms of the transaction, as represented by appellant's employees, and the terms of the leasing agreement. There are also substantial differences between the terms of the transaction as shown by the work sheet and the terms of the leasing agreement. According to Eugene's testimony, appellant's employees represented that the purchase price of the Chevrolet automobile was $2,500 and that the monthly payments were $76. The statements on the work sheet are substantially in accordance with Eugene's testimony as to the representations of the employees. The "value" of the automobile as stated on the work sheet is $2,488, and the number and amounts of the monthly payments, as stated thereon, are 50 payments of $76 each. The monthly payments (50 at $76 a month) and the down payment of $550 equal the total amount to be paid according to the work sheet, namely, $4,350. The court could reasonably conclude that by reason of the representations of appellant's employees and by reason of the statements on the work sheet, Eugene and Ruth were led to believe that they were entering into a binding agreement whereby appellant agreed to sell the automobile to them upon the terms as so represented and as set forth in the work sheet. The transaction which they did enter into was not a binding agreement upon appellant to sell the automobile upon the terms as represented or as set forth in the work sheet. The transaction, as set forth in the leasing agreement is in the form of a lease and an option to purchase. Under the provisions of the leasing agreement, appellant had the right to terminate the lease at the end of the initial period of six months or, upon 30-day's notice, at any time prior to the expiration of 24 months "from the date of commencement." Although under the amendment to the agreement Eugene and Ruth had an option to purchase the automobile on a conditional sale contract payable at the rate of $76 a month, that option is conditioned upon the payment of rental for the full period of 24 months. It therefore appears that if appellant had elected to terminate the lease prior to the expiration of the 24-month period, Eugene and Ruth would not have had an option to purchase the automobile on a conditional sale contract. Under the amendment to the agreement, if appellant had terminated the lease prior to the expiration of the 24-month period, and if Eugene and Ruth had elected to exercise the option to purchase

the automobile upon such termination, they would be required to pay, in cash, the difference between the amount of rental which they *agreed to pay* under paragraph 2 of the agreement and the amount which they *had paid* under paragraph 3. Also upon such termination, they would have been required to pay an additional amount, namely, the then "Blue Book value" of the automobile.

It is to be noted that the amount which Eugene and Ruth agreed to pay, under the provisions of paragraph 2 of the agreement, *as rental* for the first month was $266, and the amount they agreed to pay as rental for each month thereafter was an amount which was $12.64 less than the amount which they agreed to pay as rental for the preceding month. They also agreed to pay, as additional rental, 2 cents a mile for each mile in excess of 2,000 miles a month. Computation of the amount payable under paragraph 2, using the formula stated therein ($12.94 a month less than the amount payable for the preceding month) shows that, under paragraph 2, they *agreed to pay as rental* for the second month $253.36 ($266 minus $12.94), for the third month $240.92, for the fourth month $228.08, for the fifth month $215.44, and for the sixth month $202.80. It thus appears that the total amount of rental which they agreed to pay, under paragraph 2 as rental for the "initial" period of six months, was $1,406.40, or an average "rental" of $234.40 a month.

It is to be noted further that the amount which they agreed to pay, under paragraph 3 of the agreement, *"On account of the rental provided for in Paragraph 2,"* was $550 on April 16 and $76 a month beginning May 24, 1957. It thus appears that the total amount which they agreed to pay, under paragraph 3, *on account* of the rental for the initial period of six months, was $930 ($550 on April 16, and $76 on the 24th day of May, June, July, August, and September).

It thus appears that at the end of the first six months (the initial lease term) the total amount which became payable under paragraph 2 was $1,406.40, and that the amount which was actually paid, as provided in paragraph 3, was $930. In other words, at the end of the first six months, although they had paid the full amount required under paragraph 3, they would still owe $476.40 as rental under paragraph 2 (that is, the difference between $1,406.40 and $930).

If, at the end of the first six months, the appellant had terminated the lease (as it was permitted to do under the agreement), then Eugene and Ruth, in order to purchase the

automobile, would have been required to pay "in cash" $476.40 (the balance due as rental) and the Blue Book "value" of the automobile.

If appellant did not terminate the lease prior to the expiration of the 24-month period, and if Eugene and Ruth had elected to exercise the option to purchase the automobile at the expiration of that period under the provisions of a conditional sale contract, and if they had paid the rental on the basis of the formula in paragraph 2 ($12.94 less each month), the total amount which they would have paid under the lease *prior* to the expiration of the 24-month maximum term of the lease would have been $2,298 (1 payment of $550 and 23 payments of $76), and the amount which they would have been required to pay "in one lump sum," *at* the expiration of the term would have been approximately $625 (the difference between the amount *to be paid* "as rental" under paragraph 2 and the amount *paid on account of* the rental under paragraph 3.) The amount which they would have been required to pay under the conditional sale contract would have been $1,435. The total amount which they would have been required to pay under the lease and the conditional sale contract would have been approximately $4,358. That amount represents a payment of $550 (on April 16, 1957), a payment of approximately $625 (on March 16, 1957), 41 monthly payments of $76 each, and a final payment of $67. It appears that the total amount which Eugene and Ruth would have been required to pay, if they had elected to purchase the automobile under the conditional sale contract at the expiration of the 24-month period, would have been approximately the same as the amount which would have been payable under a conditional sale contract on the terms as represented by the salesman and as set forth in the work sheet.

It appears, however, that the number and the amounts of the payments under the lease and a conditional sale contract made at the end of the 24-month period would have been substantially different from the number and the amounts of the payments under a conditional sale contract as represented by the salesman and set forth in the work sheet. According to the representations and the work sheet the number and the amounts of the monthly payments would have been 50 payments of $76 each. According to the lease and a conditional sale contract thereunder, the number and the amounts of the monthly payments would have been 41 payments of $76 each and one payment of $67. There would also have been

an additional payment of approximately $625 under the lease and a conditional sale contract, and that amount of $625 would have been payable in cash at the end of the 24-month period. In other words, instead of paying the balance of the purchase price in 50 monthly installments of $76 (as represented), the payments would have been made in 41 monthly installments of $76, one installment of approximately $625, and a final installment of $67. It thus appears that there were substantial differences between the terms of the transaction, as represented by appellant's employees, and the terms of the transaction as set forth in the lease. Also, there were substantial differences in the terms of the transaction as shown by the work sheet and terms of the transaction as set forth in the lease.

The evidence was sufficient to support the findings to the effect that appellant falsely represented the terms of the transaction. The trial court could reasonably conclude that such representations constituted fraud.

It is to be noted that section 2982, subdivision (a), of the Civil Code in effect at the time of the transaction, provided that every conditional sale contract of a motor vehicle should contain all of the agreements between the buyer and seller relating to the personal property described therein, and that such agreement should recite ''the following separate items as such,'' in the following order: (1) cash price, (2) amount of down payment, (3) amount unpaid on cash price, (4) premium for insurance included in contract balance, (5) fees which will be paid to any public officer, which fees were included in contract balance, (6) amount of unpaid balance, (7) amount of time price differential, (8) contract balance, and (9) the number of installments required to pay the contract balance, the amount of each installment, and the date for payment of the installments. The leasing agreement as amended, which provided for a conditional sale contract under certain circumstances, did not comply with the provisions of said subdivision (a) of section 2982. The trial court, under the circumstances here, could reasonably infer that appellant used such form of lease and option in an attempt to evade the provisions of said subdivision, and for the purpose of defrauding Eugene and Ruth.

Appellant contends that since respondents had an unrestricted opportunity to examine the documents which they signed, they were not entitled to rely upon the representations made by its employees.

The question as to whether respondents were barred from

asserting fraud, by reason of their failure to read the documents, was a question of fact for the determination of the trial court. ██ In *Kantlehner* v. *Bisceglia*, 102 Cal.App. 2d 1 [226 P.2d 636], it was said, at page 3: "The correct rule is . . . that whether the failure to read a document is such negligence as to bar relief is ordinarily a question for the trier of fact. [Citations.] Particularly is this true where the failure to read is induced by reliance upon the fraudulent representations of the other party." ██ In the present case Eugene testified that on two occasions prior to the time the documents were signed the salesman told him that the purchase price of the Chevrolet automobile was $2,500 and that the monthly payments were $76; he signed a "group" of "blank papers"; he did not know whether the leasing agreement was filled out before he signed it; he was not told that he was leasing the automobile; he was not given a copy of any of the documents at the time he signed them; and about two weeks after he signed the documents he received copies thereof. The terms of the transaction, as indicated by the work sheet, are clear and unambiguous, and are substantially in accordance with the testimony of Eugene as to the representations of appellant's employees. The chattel mortgage refers to appellant as "Seller" and to Eugene and Ruth as "Purchaser," and it states that it is given "as security for the payment to Mortgagee of $4,350" (the amount of the payments set forth in the work sheet). The trust deed refers to the principal sum secured by it as $4,350. The dealer's notice of sale refers to Eugene and Ruth as "Purchaser." The insurance policy states that the automobile was *purchased* on April 12, 1957. The provisions of the leasing agreement and the amendment thereto, as above indicated, are ambiguous. Under the circumstances herein, the trial court did not err in determining that Eugene and Ruth were not barred from relief by reason of their failure to read the leasing agreement and the amendment thereto.

The evidence was sufficient to support the judgment upon the basis of fraud.

██ Appellant contends that the court "erred in denying defendant's [appellant's] claim of setoff." Appellant argues that since the action was for rescission, appellant was entitled to a setoff.

Appellant alleged, by way of setoff, that it was damaged "in the sum of $1,245 depreciation by reason" of the use of the Chevrolet automobile by plaintiffs for a period of 17

months from and after April 12, 1957. It did not allege that it was entitled to a setoff for the value of the use of the automobile.

Section 3408 of the Civil Code provides: "On adjudging the rescission of a contract, the court may require the party to whom such relief is granted to make any compensation to the other which justice may require."

In *Pendell* v. *Warren*, 101 Cal.App. 407 [281 P. 658], it was held that, under the provisions of section 3408 of the Civil Code (*supra*), plaintiff (vendor), upon rescission by defendant (vendee) of a contract to purchase a truck, was entitled to credit the *value* of defendant's use of the truck against a judgment for defendant for the amount of the payments made on the truck.

In the present action there was no evidence as to the value of use of the automobile by plaintiffs. The court did not err in finding that appellant was not entitled to a setoff.

In view of the above conclusion that the evidence was sufficient to support the judgment on the basis of fraud, it is not necessary to determine whether the evidence was sufficient to support the judgment upon the basis of a violation of section 2982 of the Civil Code; and it is not necessary to determine other contentions on appeal.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 23, 1961. Schauer, J., was of the opinion that the petition should be granted.