Filed 5/11/22

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RALPH BOWSER et al., | |
| Plaintiffs and Respondents, | E073609 |
| v. | (Super.Ct.No. MCC1301631) |
| FORD MOTOR COMPANY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Chad W. Firetag, Judge.

Affirmed.

Lewis Brisbois and Paul Efstratis; and Jones Day, Nathaniel P. Garrett, David J. Feder, Margaret A. Maloy, and Emily F. Knox for Defendant and Appellant.

Rosner, Barry & Babbitt, Hallen D. Rosner, and Arlyn L. Escalante; Knight Law Group, Roger R. Kirnos and Scot D. Wilson; Greines, Martin, Stein & Richland, Cynthia E. Tobisman for Plaintiffs and Respondents.

---

      \*       Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts V, VI, and VIII.

1

Husband Ralph Bowser and wife Heidi Bowser bought a 2006 Ford F-250 Super Duty truck, with a 6.0-liter diesel engine (6.0L engine).  Previously, they had owned a 2004 model of the same truck; that turned out to be a lemon.  The dealership, however, assured them that Ford had "fixed" the problems.  After the purchase, the truck — and especially the engine — required repair after repair.  Until the engine warmed up, the truck was sluggish and would not accelerate; as a result, in two separate incidents, first Mr. Bowser and then Ms. Bowser were nearly rear-ended.  The truck stalled twice on the freeway and once in an intersection.  The alternator had to be replaced four times.  After the truck had about 100,000 miles on it, the Bowsers largely stopped driving it; it mostly sat in their driveway.

The Bowsers' expert testified that, in his opinion, the 6.0L engine had defective fuel delivery and air management systems.  Stuck or mistimed fuel injectors caused incomplete combustion.  Unburned hydrocarbons built up on and eventually clogged up other components of the engine, including the turbocharger and the exhaust gas recirculation (EGR) valve.  This resulted in stalling, poor acceleration, and part failures.

Over Ford's objections, the Bowsers introduced a number of internal Ford emails and presentations.  These showed that Ford was aware that certain parts of the 6.0L engine, including fuel injectors, turbochargers, and EGR valves, were failing at excessive rates, and that Ford was struggling to find the root cause of some of these failures.  Some of the emails said that this information should be kept secret.

The Bowsers sued Ford, asserting causes of action under the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq. [Song-Beverly or Song-Beverly Act]) and for common-law fraud.  Ford conceded liability under the Song-Beverly Act.  A jury found for the Bowsers on all causes of action.  It awarded compensatory damages ($42,310.17 under the Song-Beverly Act; $43,084.68 for fraud), $84,620.34 as a statutory penalty under the Song-Beverly Act, and $253,861.02 in punitive damages.  The Bowsers elected to recover compensatory damages under the Song-Beverly Act rather than for fraud.  The trial court awarded them $836,528.12 in attorney fees plus $94,264.99 in costs.

Ford appeals.  It contends that:

(1)  The trial court erred by admitting the internal Ford documents, because they were inadmissible hearsay.

(2)  The trial court erred by admitting depositions of four Ford employees taken in a previous class action, because they were inadmissible hearsay.

(3)  The amount of the jury's award of damages on the fraud claims is not supported by the evidence.

(4)  The compensatory damages awards on the Song-Beverly claim and on the fraud claims are inconsistent.

(5)  The Bowsers cannot elect to recover compensatory damages under the Song-Beverly Act yet still recover punitive damages for fraud.

(6)  The Bowsers cannot recover both a statutory penalty and punitive damages.

3

We find no prejudicial error.  Hence, we will affirm.

I

STATEMENT OF FACTS

A.      *The Bowsers' Problems with the Truck*.

Mr. Bowser worked as a realtor; Ms. Bowser was a stay-at-home mother until about 2013, when she began working as a realtor, too.  They had three children.

In or around 2004, they bought a new Ford F-250 Super Duty truck with a 6.0L engine.  They wanted a truck so they could tow a boat and take river vacations together.  Ford claimed that the 6.0L engine was the longest lasting and had the best durability and the best performance in its class.

The 2004 truck "had multiple problems with power loss, multiple shutdowns[,] . . . multiple exhaust issues, the turbos, EGRs, injectors."  Finally, a dealership employee told the Bowsers that the dealership could not repair the truck and the Bowsers should file a claim with the Better Business Bureau (BBB).  They did so.

As a result, in December 2005, Ford replaced the 2004 truck with a 2006 truck, which also had a 6.0L engine.  The dealership assured the Bowsers that Ford had been working on the problems they had experienced "and they'd repaired and fixed all of those . . . ."  Once again, Mr. Bowser reviewed literature at the dealership that said "the Ford Super Duty [was] the best in class, having the best performance, highest quality."

4

The purchase price of the 2006 truck was $43,084.68.[1]  It came with a warranty for three years or 36,000 miles, with no deductible, plus a powertrain warranty for five years or 100,000 miles with a deductible of $100 per claim.

Mr. Bowser was the primary driver of the truck; it was his personal vehicle.  The family also had a Ford Expedition; later, they traded that in on a Chrysler 300.

Starting in April 2006, the truck would lose power when going uphill; "it felt like the truck was stuck in low gear and there was a noise from the engine." Accordingly, in May 2006, when the truck had 5,733 miles on it, the Bowsers took it in to a dealership. The dealership told them the noise was from a fan and was normal; it could not reproduce the loss of power.  It replaced a solenoid and a gasket in the transmission.

Also in May 2006, the horn started going off by itself.  The Bowsers took the truck in to a dealership, which fixed the problem.

In November 2006, when the truck had 13,279 miles on it, the Bowsers brought the truck in to a dealership because the air conditioner would blow warm air.  The dealership could not reproduce the problem.

In April 2007, when the truck had 19,470 miles on it, the Bowsers brought it in to a dealership because the air conditioning control panel had gone blank and one of the power windows made noise when going up and down.  The dealership fixed these problems.

---

[1]     The record does not explain why, if Ford was replacing the 2004 truck, the Bowsers paid anything for the 2006 truck.

In October 2008, when the truck had 39,622 miles on it, the Bowsers brought it in to a dealership because the battery and check engine lights were going on and off. The battery was nearly dead, so the dealership replaced it.

In November 2008, the alternator had to be replaced.

In June 2009, at 51,324 miles, the Bowsers had the "first major incident" with the truck. Mr. Bowser was driving on the freeway at about 65 miles an hour when the engine shut down; thus, the power steering and power brakes also shut down. After he managed to bring it to a stop, still in lane, he turned the key and it started up again. He pulled over to the side of the freeway. It took him 15 minutes to calm down, start it again, and drive home. He took it in to a dealership, but they could not reproduce the problem. After that, the truck would be sluggish until the engine warmed up.

In August 2009, the alternator had to be replaced again.

In September 2010, Mr. Bowser stopped at a stop sign, made a right turn, and then was almost rear-ended because the truck would not accelerate. Hence, when the truck had 66,350 miles on it, he took it in to a dealership. He reported that, until the engine warmed up, the truck lacked power and would not accelerate. The dealership found that the fuel injector control module (FICM) was "burnt black" and two fuel injectors were misfiring. It replaced those parts.

In November 2010, the engine shut down on the freeway again. Mr. Bowser took it in to a dealership; it had 67,959 miles on it. He reported that, at times, the engine would crank but not start. The dealership found that the fuel pump and the plugs at the

end of the fuel rails were leaking air.  It replaced the fuel pump and the seals on three of the fuel injectors.

In December 2010, the powertrain warranty expired.

In November 2011, the engine shut down in an intersection.  It took multiple tries to get it to restart.  Mr. Bowser took it in to a dealership.  The truck had 82,735 miles on it.  He reported smoke and a loss of power.  The dealership found oil in the coolant.  The oil cooler had failed; also, the FICM power was weak.  The dealership recommended cleaning the intake and EGR valves, taking the turbocharger apart and reconditioning it, and flushing the cooling system.  If that did not work, the head gasket might be blown.  The recommended repair was going to cost $4,900.

Mr. Bowser took the truck to another authorized repair facility for a second opinion. It confirmed that there was oil in the water, there were black burn marks on the FICM, and the EGR cooler had failed.  It replaced the FICM, the EGR cooler, and the oil cooler (but did no work on the turbocharger).

At the facility's suggestion, Mr. Bowser called Ford customer service, which gave him a $2,000 "goodwill" service credit.  Ford also got the facility to agree that it would charge warranty rates, which are lower than retail rates, for the repairs.  Thus, the facility did the repairs for the $2,000 service credit plus $1,282.42.

Mr. Bowser continued to have problems with "stalling, . . . lack of power, black smoke."  In July 2012, at 90,942 miles, he took the truck in to an authorized repair

7

facility. He reported that it "lack[ed] power when cold." The facility found that four fuel injectors were failing. Mr. Bowser declined the repair.

Once, when Ms. Bowser was driving the children to school, she stopped at a stop sign, then turned right, just as Mr. Bowser had done in September 2010; like him, she was almost rear-ended because the truck would not accelerate.

In November or December 2012, Ms. Bowser was driving with her youngest child; she was getting ready to make a left turn, when the engine shut off and she lost power steering. "[C]ars were coming forward and swerving and honking . . . ." She was able to restart the truck and drive home. After that, she refused to drive the truck because she considered it unsafe and unreliable.

The Bowsers bought a Ford Flex for Ms. Bowser. They tried to trade in the truck on a new vehicle, but several Ford dealerships said they could give them only about half of the Blue Book value, "because of the issues of the 6.0 . . . ."

In July 2013, when the truck had 98,917 miles on it, Mr. Bowser took it into a dealership. He reported that an emission warning light was on and the air conditioner was not working properly. The dealership replaced a failed glow plug and a damaged hose.

Meanwhile, sometime between February and April 2013, Mr. Bowser learned that there was a class action against Ford involving the engine. He opted out, because he did not want money to fix the truck; he just wanted to get rid of it.

8

Instead, in May 2013, he filed another claim with the BBB. The BBB denied it as outside its jurisdiction because the truck had been out of warranty for more than six months. He had a lawyer send Ford a buyback request. Ford offered $15,000 but refused a buyback. Mr. Bowser did not accept, again because he did not want the truck.

After that, the truck mostly sat in the Bowsers' driveway. Between July 2013 and the trial in March 2019, Mr. Bowser drove it about 6,000 miles.

In November 2015, the battery had to be replaced. In December 2015, the alternator had to be replaced yet again. In 2017, in a Costco parking lot, the truck would not start; it had to be towed home. The alternator had to be replaced for the fourth time. The last time the truck was driven, by the Bowsers' son, it broke down and left him stranded half a mile from home. At the time of trial, it had 106,300 miles on it. It had been in for repair for a total of 66 days.

Ford stipulated that it was liable under the Song-Beverly Act.

B.    *Darrell Blasjo, the Bowsers' Expert*.

The Bowsers called Darrell Blasjo as their automotive expert.

Blasjo testified that the 6.0L engine was supplied to Ford by Navistar. It was launched in November 2002. In model years 2003-2007, Ford sold 1.3 million vehicles with the 6.0L engine. Blasjo had been aware of issues with the 6.0L engine since it first came out.

He explained that the 6.0L engine is a V-8, with two banks of four cylinders each. Air entering the engine goes through the turbocharger, which compresses it. The

9

turbocharger has vanes that spin, like a jet propeller.  The vanes can adjust so as to compress the air more or less and thus to deliver more or less boost.  "[T]he more air you can put into the motor, the . . . more powerful combustion you can have."

As a piston goes down, it draws air in through the intake valve into the combustion chamber.  If the engine is not warmed up yet, a glow plug preheats the cylinder.  As the piston rises, it compresses the air and thus heats it.

A high-pressure fuel pump sends fuel down the fuel rails, which deliver fuel to each fuel injector.  The fuel injector control module (FICM) controls the fuel injectors.  At just the right moment, a fuel injector sprays fuel into the combustion chamber.  The heat ignites the fuel; the resulting explosion drives the piston down.  When it comes up again, it pushes the exhaust gases out through the exhaust valve.

The EGR cooler cools the exhaust gas.  The EGR valve sends some of the exhaust gases back into the intake system; this reduces pollution.  The rest flow through the turbocharger again, this time providing the power that makes it spin.  Finally, they exit through the exhaust.

In Blasjo's opinion, the 6.0L engine had multiple defects of the FICM and the fuel injectors.  If a fuel injector is mistimed or sticking, the engine will be sluggish.  It will also cause incomplete combustion, which can lead to coking.

Coking results from the buildup of unburned hydrocarbons on parts of the exhaust system and, because some exhaust gases are recirculated, on parts of the intake system as well.  Coking can make the turbocharger stick, causing either too much or too little boost;

10

smoke may come out of the exhaust. Pressures and temperatures may become excessive, which will cause parts to fail.

Coking can also clog the EGR cooler and the EGR valve. If the EGR cooler has a "blowout," that will send smoke out the tailpipe. Coking may also blow out the oil cooler, causing oil to leak into the coolant. In short, coking can "cause a loss of power, loss of towing capacity, and impairment of acceleration[.]"

According to Blasjo, Ford never managed to fix the problems with the fuel injectors or the turbocharger. It never did a root cause analysis of the problems with the 6.0L engines.

Ford issued technical service bulletins (TSBs) to tell local technicians how to diagnose and repair common issues. Ford put out "well over" 100 TSBs on the 6.0L engine. At one point, there was a class action against Ford involving the 6.0L engine. Moreover, Ford sued Navistar.

In Blasjo's opinion, the Bowser truck's loss of power when going uphill in April-May 2006 was the first manifestation of the defects of the engine.

The truck's loss of power in June 2009 was also related to the defects of the engine. It indicated that coking was making the turbocharger stick. The FICM could have been causing the problem.

The September 2010 loss of power was also related to the defects of the engine.

The November 2011 problems were "all engine[-]related issues." The failures of the EGR cooler, the EGR valve, and the oil cooler were all due to coking. The smoke indicated either too much fuel delivered or too little fuel burned.

Blasjo admitted that none of the repair orders mentioned coking. He also admitted that the turbocharger and the EGR valve never had to be replaced. However, one dealership did recommend reconditioning the turbocharger; Blasjo believed it was sticking intermittently, causing low power.

The problems with the Bowsers' truck were consistent with the problems that Blasjo had seen in other vehicles with the 6.0L engine. However, it had additional problems, unrelated to the engine. He believed it had an underlying electrical problem; that was what caused two FICMs to be burnt, three alternators to fail, two batteries to die, the warning lights to flicker, and the air conditioner control panel to go blank.

C.      *Internal Ford Emails and Presentations.*

The Bowsers introduced a number of internal Ford emails and presentations. We list these in chronological order.

Exhibit 39 was an email chain dated May 2002 sent by Charlie Freese. Freese's title was Chief Engineer, Diesel Engines.

In one email, dated May 15, 2002, he said, "We face multiple high risk items, which will influence a decision to delay J#1."[2] Certain "open issues" were "of

---

**2**      Blasjo explained that "J#1" meant Job 1, which meant the beginning of production.

12

particularly great concern." These included fuel injector failures. Freese planned to either "re-qualify or scrap" all existing injectors. He asked for an explanation of "how out-of-spec injectors are being produced at such a high frequency." (Capitalization altered.)

In another email in the chain, dated May 29, 2002, Freese noted that the turbocharger of a test vehicle had failed. There were "[n]ew concerns" about "loose injectors." He requested a "[r]oot [c]ause [d]efinition," a "[c]ontainment [p]lan," and a "[c]orrective action plan."

Exhibit 41 was an email chain dated August 2002 sent by Freese. He listed steps that were being taken to fix issues with the 6.0L engine, including stalling and fuel injector failures.

Exhibit 42 was an email chain dated November 2002 sent by Steven Henderson. Henderson's title was Power Train Purchasing Manager. He said, "[W]e're in the middle of 6.0L launch, and . . . things are not going well. J1 was delayed a full week for [Navistar] to work on the issues, but they are not fully resolved yet."

Exhibit 43 was a list or outline dated July 2003. No author was indicated. It was entitled, "2003 6.0L Powerstroke Launch Overview." It listed "[c]urrent [q]uality [c]oncerns," including "[l]ack of power when taking off with a cold engine."

Exhibit 45 was an email chain including an email dated February 2004, from John Koszewnik. Koszewnik's title was Director, North American Diesel. He said Ford would hold up any changes that involved increased cost; these included changes to the

13

turbocharger that he believed were necessary. He added, "If we don't implement a revised process soon, the future is predictable. . . . We will not implement needed quality improvements . . . that add cost." "It's sad to see that the 'rules' have been set up as they are without allowance for quality improvements that add cost but save much more in warranty in the long run."[3]

Exhibit 47 was an email chain including a September 2004 email sent by Frank Ligon. Ligon's title was Director of the Customer Service Division. He said Ford was "putting together a comprehensive strategy to bring all 6.0 up to standard." "We are seeing a new group of concerns that range from chaffing [*sic*] of various wire harnesses causing drivability concerns, sensors that are failing at a high rate and turbo concerns." "At this point we do not have a definitive repair action . . . to properly address the concern universe." "Bottom line is we are not 'out of the woods' on this 6.0 and in fact may experience repeat symptoms once certain repairs are performed . . . ."

The email was marked "privileged and confidential." It added, "This is very confidential!!!" "I strongly urge that this information NOT be shared at this time until the 'official' action is announced."

Exhibit 189 was an email chain dated October 2004 sent by Ligon. He said, "We're buying back hundreds of these things a month and if the choice is changing the

---

**3** Koszewnik testified that the changes he was recommending in Exhibit 45 were eventually approved. Blasjo conceded that they were implemented in the 2005 model year, i.e., before the Bowsers' truck was built.

injectors or buying back the unit I think we would all rather change the injectors."

"[T]here are no fixes on certain symptoms."

Exhibit 48 was an email dated October 2004 sent by Mike Berardi. Berardi's title was Tough Truck Service Engineering Manager. He proposed several alternative ways "to reduce 6.0L [buybacks]." He cautioned, "[T]hese initiatives will not eliminate the [buybacks], as customers will continue to come into the dealership multiple times until we can honestly eliminate all concerns with the 6.0L." "You had also mentioned throwing the 'Kitchen Sink' at the vehicle during the first repair attempt to help eliminate the need to come back a second time. That particular philosophy is opposite of what we have been training our dealers to do and could lead to a very expensive warranty bill . . . ."

Exhibit 54 was an email chain dated July 2005 sent by Koszewnik. He said, "[W]e had a lot more replacements of four injectors (a whole bank) and eight injectors beginning in December and onward. It seems to have peaked in March and is now still high but on a decline. Any insights into why this occurred and is still occurring?"

Exhibit 55 was an email chain dated September 2005 sent by James Williams. At some point (not necessarily September 2005), Williams's title was Resident Powertrain Engineer. He said, "[W]e are seeing a huge increase in early warranty for the 6.0L engine from June 1st . . . . The June projections are showing that we are going to come in

15

10-12 R/1000[4] higher than the month of May." He listed the most common early warranty issues, including turbochargers and fuel injectors.

Exhibit 160 was an email chain, including an email dated October 2005 sent by Scott Eeley. Eeley was a Six Sigma Black Belt. He said, "Mr. Ligon continually pressured for me to confess the product was crap . . . ."

Exhibit 162 was an email chain dated January 2006 sent by Koszewnik. He said, "[M]y November warranty was $7.4 million just for the injectors. I learned yesterday that this number matured up to $8.0 million. ( . . . Absolutely disgraceful.) December will be much worse than November." The 2007 high-pressure fuel pump "has been and continues to be a disaster." There had been "fuel system failures . . . due to out of spec parts."

Exhibit 61 was an email chain dated January 2006 sent by Koszewnik. It said, "Injector warranty remains our higher warranty item and last month went through the roof . . . $9.8 million for a single month." "Bottom line, the injectors develop more stiction over time . . . which delays the start of injection . . . and results in poor/rough accel's when the engine is cold. We are getting many repairs for this issue."

Exhibit 62 was a PowerPoint-style presentation dated January 2006 by Mark Freeland. It was entitled, "6.0L Powerstroke Injector: December 2005 Warranty Claims." It said, "It is likely that these symptoms are all the result of the same root

_____

4    Repairs per thousand.

16

causes." "There have been many changes made to 'fix the [i]njector' warranty issue, but none seem to have been effective at reducing the base level of the warranty."

Exhibit 63 was a PowerPoint-style presentation dated February 2006 by Barb Samardzich. Samardzich was "[D]irector of [T]ruck in [P]roduct [D]evelopment." She listed "the top 6.0 issues," including fuel injectors, EGR valves, and turbochargers.

Exhibit 198 was a PowerPoint-style presentation dated February 2006. No author was indicated. It was entitled, "ITEC and Large Diesel Strategy Review." It was labeled, "Ford secret draft." It said, "The diesel strategy is potentially the single most important issue facing Ford[.] [¶] Over $2 billion of annual Super Duty profit is at risk[.]" "Numerous issues exist with [Navistar]," including "[u]nacceptable quality, cost, and delivery[.]"

Exhibit 64 was an email chain dated February 2006 sent by Koszewnik. It said, "FYI only. Don't forward or reference."

It attached an earlier email by Koszewnik, saying that EGR warranty claims were "running about $36 million a year, but we have been as high as $5 million a month! A large part of this was driven by [Navistar]'s use of a 15-newton linear solenoid EGR valve versus the industry standard of a 200-newton DC motor driven valve."

"Charlie Free[s]e told me he also considered an EGR valve upgrade to be a 'no brainer' but . . . [t]he Program Team would always fall back on the argument that they didn't pay originally for a deficient design, therefore, they weren't going to pay for an

17

upgrade.  [Navistar]'s position was simple, no added pricing, no added content.  Sound familiar?"

Exhibit 65 was an email chain dated June 2006 sent by Mike Frommann. Frommann was a Warranty Program Manager for purchased powertrains.  He said, "We unfortunately exceeded our own cylinder pressure specs in normally performing engines. We don't want to have our cylinder pressure specs published or documented by having them subpoenaed or we might face a class action."  He added, "I recommend we delete these e-mails."

Exhibit 188 was an email chain dated October 2006 sent by Steven Johnston. Johnston was a Product Concern Engineer.  He relayed, with his added comments, the opinions of Chris Wilde, a Reacquired Vehicle (RAV) Technical Specialist.

Wilde had said, "Repeat turbocharger failure needs to be investigated and the root cause determined."  "I feel the . . . turbocharger is at fault for many repeat 6.0L driveability concerns and the root cause of the problem has not been addressed.  The turbochargers continue to fail over and over again.  I feel that part of the failure is due to the design but I wonder if there is something else causing excessive carbon build up . . . . Turbocharger cleaning is just a band aid to reduce the cost of replacing turbochargers. Cleaning the turbochargers is just another repair on the way for a vehicle to become a [buyback]."

Blasjo testified that the Bowsers' truck had the problems that were discussed in the documents that he had reviewed. He also testified that Ford never disclosed the information in these documents.

The Bowsers testified that, if they had been aware of the problems with the 6.0L engine, they never would have bought the 2006 truck.

D.      *Depositions of Ford Employees.*

Portions of the depositions of current or former Ford employees, taken in an earlier action, were played for the jury.

1.      *Depositions played by the Bowsers.*

a.      *Ligon deposition.*

Frank Ligon was a retired Ford employee. He had been Director of Vehicle Services and Programs in the Customer Service Division. This was an "E band" — i.e., executive — position. At Ford, a director is "pretty high up."

Ligon testified that the launch of the 6.0L engine was delayed due to concerns about drivability — specifically, rough running and poor idling. These concerns were resolved before launch.

Within a few months after the launch, however, Ligon learned that the 6.0L engine still had problems with rough running and poor idling. There were also concerns about the turbocharger and the fuel injectors.

In a March 2004 email (not in our record) concerning fuel injector scuffing, Ligon said, "The fixes are available, but there isn't a 'preventable action' the dealers can take to

keep the failure from occurring." He also said, "I'm not sure how much of this we want beyond the technical community, that's why I'm restricting this to you . . . ." At some point, the scuffing concern was resolved.

In September 2004, Ligon received an email (also not in our record) from a Ford engineer headed, "6.0-liter - Save the Brand." It suggested offering 2003 and 2004 customers an extended warranty on the engine to 150,000 miles. Ligon agreed. He did not remember what became of the suggestion.

Everyone involved at Ford was concerned about resolving the problems with the 6.0L engine. In Ligon's opinion, Ford did ultimately resolve them.

> b. *Frommann deposition.*

Mike Frommann worked for Ford as Warranty Program Manager for purchased powertrains.

In 2006, Frommann learned that a test engine had exceeded Ford's cylinder pressure "specs," but only under cold conditions. Excessive cylinder pressure could blow out a head gasket; it could also force fuel into the cooling system and "clog things." Ford fixed the problem by issuing a recall and recalibrating the engine. Frommann admitted telling coworkers to delete his email about this issue, because it could be misleading. He also deleted his own copy of the email.

Frommann admitted that the 6.0L engine had more repairs per thousand than any other Ford engine.

### c.  *Freeland deposition.*

Mark Freeland was a retired Ford employee.  While at Ford, he saw evidence that compression seals were leaking combustion gases after a cold start.  He gave a PowerPoint presentation (inferably Exhibit 62) to Koszewnik and others.  Most of the people present "strongly disagreed" with what he said.

### d.  *Eeley deposition.*

Scott Eeley was a current Ford employee.  As of 2005, he was a Six Sigma Black Belt.  He testified that Ligon had "pressured" him to "confess" that the 6.0L engine was "crap" and could not be fixed.

Ligon, for his part, testified that he did not know who Eeley was and did not remember this conversation.

### 2.  *Koszewnik deposition, played by Ford.*

Koszewnik testified that, as of December 2002, "there were early indications from the . . . dealers that there were problems with some of the components" of the engine.  He was charged with "[i]nvestigat[ing] failures in the field on the 6.0 liter" and "[i]dentifying root cause and corrective action . . . ."

Koszewnik's group found several root causes of fuel injector problems; by 2004 or 2005, they had fixed them.  However, "[t]here [we]re still some injector failures in the field."

The group also found several root causes of turbocharger problems, including coking due to gases coming from the combustion chamber.  In addition, "[t]he EGR valve

21

would stick [and t]he EGR cooler would build up residue." They fixed all three of these problems with a software change. By the time Koszewnik left Ford, it had "dramatically reduced the [repairs per thousand] for injectors . . . ."

E.      *Declarations of Ford Employees*.

1.      *Mina Shams*.

Mina Shams's title was 6.0L Diesel Systems Diagnostic Supervisor. In 2007, in the action by Ford against Navistar, she had testified, "From the time of its launch in late 2002, the 6.0L has had high rates of repair and warranty repair costs." "Navistar used a new, non-industry standard fuel injector system for the 6.0L, which has resulted in a large number of warranty claims." "Navistar also used a new turbocharger on the 6.0L that is more complex than the turbocharger that Navistar had previously used in engines supplied to Ford. Ford has received numerous warranty claims relating to the turbocharger." "[T]ests found problems in more than 95% of the turbochargers returned under warranty."

2.      *Bob Fascetti*.

Bob Fascetti's title was Director of V-Engine and Diesel Engineering. In 2007, in the action by Ford against Navistar, he had testified, "Ford has experienced unprecedented repair rates with the 6.0L engines. The 6.0L has had the largest R/1000 (repairs per thousand) rate ever experienced by Ford for an engine in widespread production. In fact, the 6.0L, which represents only 10% of Ford's total engine volume, accounts for 80% of all of Ford's warranty spending on engines. Additionally, warranty

22

spending on the 6.0L accounts for approximately 25% of Ford's overall warranty spending."

F.  *Robert Kuhn, Ford's Expert*.

Ford called Robert Kuhn as an expert on "how major automakers use warranty data . . . ."

He testified that every new vehicle model is tested before launch, during development.  Nevertheless, after launch, some vehicles will need some repairs.  That is why manufacturers offer a warranty.

Manufacturers track warranty repairs "to identify issues and improve that product almost immediately."  No manufacturer discloses the information that it gathers during development and from tracking warranty repairs to the general public.  Instead, they "use the information to generate TSBs or service actions based on the issues they identify so . . . there's something in place to help the dealer correct that issue. . . .  [T]hey will give the dealerships the tools and the information that they need to correct those issues."  It would not be helpful to disclose warranty data for prior model years, as the problems may have been fixed.

A customer can get the TSBs applicable to his or her vehicle, on request.  Customers can also get information from J.D. Power and *Consumer Reports*.

Kuhn agreed that warranty repairs on the 6.0L engine "were higher than usual[.]"  In his opinion, Ford acted "reasonably and responsibly" by "immediately . . . looking at those issues, trying to [determine their] root cause . . . and come up with corrective

23

actions . . . ." It formed a "SWAT team" of engineers to work with dealers, salespeople, and customers.

According to Kuhn, Exhibit 43 (the list of concerns dated July 2003) showed that Ford was making "a whole lot of effort . . . to identify issues and resolve [them]." Ford had closed some issues and had set prompt deadlines for the resolution of the remaining issues.

In 2003-2004, Ford made several improvements to the fuel injectors. As a result, the rate of fuel injector warranty repairs went down with every model year; between June and September 2005, Ford did only 23 fuel injector warranty repairs. Likewise, total repairs per thousand for the 6.0L engine went down with each model year.

G.    *Punitive Damages Phase*.

In the punitive damages phase of trial, an expert forensic accountant, testified that Ford's net worth was $36.619 billion.

## II

## STATEMENT OF THE CASE

The Bowsers filed this action against Ford in 2013. By the time of trial, they were asserting causes of action for common-law fraud, on two theories — intentional misrepresentation and fraudulent concealment — and for violation of the Song-Beverly Act.

After a month-long trial, a jury returned special verdicts in favor of the Bowsers and against Ford on all issues. On the Song-Beverly claim, it awarded $42,310.17 in

24

compensatory damages, plus $84,620.34 (double the compensatory damages) as a statutory penalty. On each of the two fraud claims, it awarded $43,084.68 in compensatory damages. Finally, on the fraud claims, it awarded $253,861.02 (six times the Song-Beverly compensatory damages) in punitive damages.

The Bowsers elected to recover compensatory damages under the Song-Beverly Act rather than for fraud.[5] Accordingly, the trial court entered judgment awarding the Bowsers $42,310.17 in compensatory damages, $84,620.34 as a statutory penalty, and $253,861.02 in punitive damages.

Ford filed a motion for new trial and a motion for judgment notwithstanding the verdict (JNOV). The trial court denied both motions.

On the Bowsers' motion, the trial court awarded them $836,528.12 in attorney fees and $94,264.99 in costs.

### III

### THE INTERNAL FORD DOCUMENTS AS HEARSAY

Ford contends that the trial court erred by admitting certain internal Ford emails and other internal Ford documents — specifically, Exhibits 39, 41, 42, 43, 45, 47, 48, 54, 55, 61, 62, 63, 64, 65, 160, 162, 188, 189, and 198 (documents) — because they were inadmissible hearsay.

---

[5] Thus, they elected to recover the *lesser* amount of *compensatory* damages. Presumably this was so they could also receive the civil penalty and attorney fees under the Song-Beverly Act.

25

A.    *Additional Factual and Procedural Background.*

In their trial brief, the Bowsers argued that some of the documents were admissible, either because they were not offered for their truth, or because they were admissible under the exceptions for statements by a party-opponent, authorized admissions, declarations against interest, and/or business records.[6]

Ford filed a motion in limine to exclude the same documents and several others. That motion, and the Bowsers' opposition to it, are not in the record. During the argument on the motion, however, Ford's counsel objected to these particular documents as inadmissible hearsay, and also as irrelevant and more prejudicial than probative.

The Bowsers' counsel responded that they were authorized admissions. Alternatively, they argued that Eric Kalis, a Ford custodian of records, would lay the foundation for their admission as business records; they claimed that he had done so in his deposition in another action. The trial court therefore postponed ruling.

Ultimately, the Bowsers were not able to call Kalis. First, Ford's counsel said he was on vacation; then they decided not to call him at all. His deposition was played for the jury  but has not been provided to us.

The Bowsers' counsel had their expert, Blasjo, and Ford employee Arnold Kromberg testify about the documents. The trial court allowed Ford a continuing hearsay objection.

---

[6]    Ford's opposition to the Bowsers' trial brief is not in the record.

Blasjo testified about most of the documents. In general, he read their contents into the record, interpreted terms used in them, and testified that he relied on them in forming his opinions. He also testified that they showed that Ford was aware of the problems with the engine that the Bowsers ultimately experienced. He testified to the job titles of Freese, Koszewnik, Johnston, and Ligon; he identified Ligon as a "very high-ranking person at Ford[.]" Based on Blasjo's testimony, over Ford's repeated hearsay objections, the trial court admitted most of the documents.

Kromberg worked for Ford as a Diesel Calibration Quality Supervisor. As to each of the documents (except Exhibit 160), he testified that the author was a Ford employee. In most instances, he testified about the author's job title — sometimes based on his own personal knowledge, but sometimes based on what the document said. Also, in most instances, he testified that the content of the document related to Ford business. Finally, as to each such document, he testified that he had no reason to believe that it was not a genuine Ford document.[7] Ford's counsel objected, including based on hearsay, but the trial court overruled the objection and admitted (or readmitted) these documents.

Exhibit 160 was an email chain sent by Eeley. In his deposition, which was played for the jury, he admitted that he had written at least one of the emails in the chain. Ford's counsel objected to Exhibit 160 on grounds including hearsay. The trial court overruled the objection and admitted it.

---

[7] We question whether all of the documents were adequately authenticated. Ford, however, does not argue that they were not and thus has forfeited any such argument.

In its motion for new trial, Ford argued that the trial court had erred by admitting the documents, because they were hearsay.  The trial court denied the motion.  It said it had previously ruled that "the documents . . . were admissible as authorized admissions (Evid. Code, §§ 1220 and 1222), or as business records (Evid. Code, § 1271) . . . ."  "[T]he Court finds no reason to find that its prior decisions regarding the admissibility of these documents . . . was improper."

B.     *Discussion*.

Hearsay is "a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."  (Evid. Code, § 1200.)  Hearsay is inadmissible, unless it comes under a statutory exception.  (E.g., Evid. Code, §§ 1220-1390.)

"We review the trial court's determination as to the admissibility of evidence, including the application of exceptions to the hearsay rule, for an abuse of discretion. [Citations.]  Under this standard, the trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  [Citation.]"  (*Thompson v. County of Los Angeles* (2006) 142 Cal.App.4th 154, 168.)

1.     *Forfeiture*.

Ford forfeited this contention by not including Kalis's deposition in the appellate record.

28

"A ""'judgment or order of the lower court is presumed correct [, and a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.'" [Citation.]'" (*In re Julian R.* (2009) 47 Cal.4th 487, 498-499.) As a corollary, " . . . '[t]he appellant] has the burden of providing an adequate record. [Citation.] Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant].' [Citation.]" (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.)

The Bowsers' counsel represented that, in a deposition taken in another action, Kalis had laid the foundation for the admission of the documents as business records. That deposition was played for the jury, but Ford has not included it in the appellate record. Ford argues that some depositions were erroneously admitted, but not Kalis's. The record therefore fails to eliminate the possibility that Kalis's deposition provided an adequate foundation for the admission of the documents.

We may reject Ford's present contention for this reason alone. Nevertheless, we also consider it on the merits.

2.      *Authorized Admissions.*

a.      *General principles.*

There is a hearsay exception for a statement by the opposing party: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ." (Evid. Code, § 1220.) A corporation, however, can speak only through its officers and agents. Accordingly, statements

29

assertedly made by a corporation are not usually analyzed as party admissions under Evidence Code section 1220, but rather as authorized admissions under Evidence Code section 1222.

Under Evidence Code section 1222, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if:  [¶]  (a)  The statement was made by a person authorized by the party to make a statement or statements for him concerning the subject matter of the statement . . . ."  (Evid. Code, § 1222, subd. (a).)

> b.      *Communications between corporate agents.*

Ford argues that the authorized admission exception "does not apply to communications, like those at issue here, *between* purported corporate agents."  It cites the Restatement (Second) of Agency section 287 (section 287).  That section, as relevant here, provides:  "Statements by an agent to the principal or to another agent of the principal are not admissible against the principal as admissions . . . ."[8]  This particular section of the Restatement has never been cited in a California case.

We decline to follow section 287, for two reasons.

First, "[t]he federal courts and most state courts" do not follow section 287. (D. Binder, Hearsay Handbook (4th ed., Nov. 2021 Update) § 35:8.)  They "except from the hearsay rule an assertion made by an agent in the course and scope of the agent's employment, when offered against the principal by a party-opponent, no matter to whom

---

**8**      This argument does not apply to Exhibits 39 and 55, which were sent to Navistar employees as well as Ford employees.

30

the assertion was addressed." (*Ibid*.) Section 287 has been cited in approximately nine cases nationwide, and some of those used it in dictum, distinguished it, or declined to follow it. (See Rest.2d of Agency, § 287, Case Citations by Jurisdiction.) McCormick recognized the split of authority but concluded that "[r]eliability . . . favored admissibility of such in-house statements." (2 McCormick on Evid. (8th ed. Jan. 2020 Update) § 259.) Accordingly, the drafters of the *current* Restatement — the Restatement (Third) of Agency — chose to omit any form of section 287. (Rest.3d of Agency, Parallel Tables.)

Second, section 287 is inconsistent with at least two California cases, which held that a statement by one employee to another was an authorized admission of the employer. (*O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 570-574 [vice-president's statement to managers about company policy]; *Levy-Zentner Co. v. Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 786 [employee's report to supervisor on the cause of a fire].) We recognize that "'"cases are not authority for propositions not considered."'" [Citation.]" (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11.) Even so, we must be reluctant to adopt a new rule when it would invalidate the results in multiple prior cases.

c.     *Communications between corporate agents*.

Different jurisdictions have adopted two different versions of an authorized admission exception. In the older, narrower, now-minority version, it must be shown that the agent's authority included the authority to speak for the principal — that the agent was "a so-called 'speaking agent.'" (2 McCormick on Evid. (8th ed.) § 259; accord,

31

4 Jones on Evidence (Dec. 2020 update) § 27.18; e.g., Fed. Rules of Evid., rule 801(d)(2)(C).) In the newer, "expansive," now-majority version, it need only be shown that the agent's statement "concerned a matter within the scope of the declarant's employment and was made before that relationship was terminated." (2 McCormick on Evid. (8th ed.) § 259; accord, 4 Jones on Evidence (Dec. 2020 update) § 27.18; e.g., Fed. Rules of Evid., rule 801(d)(2)(D).)

From the wording of Evidence Code section 1222, it might appear to adopt the narrow version: The agent must be "authorized . . . to make a statement . . . for [the principal] concerning the subject matter . . . ." Our Supreme Court, however, has indicated that the scope of this exception is actually closer to the expansive version. In *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, it said: "The rule is that ""whatever is said by an agent . . . , either in the making of a contract for his principal, or at the time, and accompanying the *performance of any act, within the scope of his authority*, . . . of the particular contract or transaction in which he is then engaged, is, in legal effect, said by his principal, and admissible as evidence . . . . But declarations or admissions by an agent, of his own authority, and not accompanying the making of a contract, or the doing of an act, in behalf of his principal, . . . are not binding upon his principal . . . and are not admissible . . .'" [Citation.]' [Citation.]" (Ellipses in original.) (*Id.* at p. 1077.)

One court has stated (in dictum), that the adoptive admission exception "has been interpreted in California as only applying to high-ranking organizational agents who have

32

actual authority to speak on behalf of the organization. [Citation.]" (*Snider v. Superior Court* (2003) 113 Cal.App.4th 1187, 1203.) It would be more accurate to say that, *when based on job title alone*, it applies only to high-ranking organizational agents. (E.g., *Koussaya v. City of Stockton* (2020) 54 Cal.App.5th 909, 927 ["We have no difficulty concluding the Chief of Police was authorized to make statements on behalf of the City concerning the conduct of police officers under his command"]; *Greenspan v. LADT, LLC* (2010) 191 Cal.App.4th 486, 524 ["because Shy was the manager of [two companies], his statements were admissible as to them under the exceptions for party or authorized admissions."]; cf. *O'Neill v. Novartis Consumer Health, Inc.* (2007) 147 Cal.App.4th 1388, 1402-1403 [declarant's job title, Director of Regulatory Affairs, did not show he had authority to admit product had not been determined to be safe].) However, when based on evidence of the declarant's duties and responsibilities, it can apply to lower-ranking agents. (E.g., *Consolidated Management Group, LLC v. Department of Corporations* (2008) 162 Cal.App.4th 598, 604, 614 [salesman was authorized to send out promotional materials]; *W.T. Grant Co. v. Superior Court* (1972) 23 Cal.App.3d 284, 286-287 [manager of one store in multistore chain was authorized to make statement to subordinate about company policy]; see also *Crawford v. County of Sacramento* (1966) 239 Cal.App.2d 791, 799-801 [declarant "was *neither* high in the hospital's hierarchy and therefore its spokesman to make admissions, *nor* did the alleged admission concern a matter within the scope of his agency", italics added].)

33

"In general, . . . the determination requires an examination of the nature of the employee's usual and customary authority, the nature of the statement in relation to that authority, and the particular relevance or purpose of the statement." (*O'Mary v. Mitsubishi Electronics America, Inc.*, *supra*, 59 Cal.App.4th at p. 570.)

A statement is "admissible as an authorized admission . . . only . . . where a proper foundation has been laid as to the declarant's authorization to speak on behalf of the party against whom the statement is offered. [Citations.]" (*Rochlis v. Walt Disney Co.* (1993) 19 Cal.App.4th 201, 217, disapproved on other grounds in *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1251.) The proponent of the evidence must introduce "evidence sufficient to sustain a finding of such authority . . . ." (Evid. Code, § 1222, subd. (b).)

"The declarations of an [alleged] agent are not admissible to prove the fact of his agency or the extent of his power as such agent. [Citations.]" (*Howell v. Courtesy Chevrolet, Inc.* (1971) 16 Cal.App.3d 391, 401.) Here, then, hearsay statements in the documents themselves cannot be used to prove that they were authorized admissions. For example, the fact that Koszewnik's email signature described him as "Director, North American Diesel" cannot be used to prove that he *actually was* Ford's Director of North American Diesel.

At one point, counsel for the Bowsers were under the misapprehension that they merely had to lay the foundation before the trial court, as an in limine matter, by means of declarations. Actually, they also had to lay the foundation before the jury, by means of

34

oral testimony and admissible exhibits.  (See Evid. Code, § 403; Assem. Com. on Judiciary com., 29B pt. 1B West's Ann. Evid. Code (2015 ed.) foll. § 403, pp. 17-18.)  If they laid the foundation in limine but not at trial, the trial court had to sustain Ford's trial objections.  Contrariwise, if they laid the foundation at trial, even though not in limine, the trial court could properly admit the documents.  Accordingly, we confine our consideration to the evidence admitted at trial.

> d. *Application to the documents here*.

> i. *Documents admissible as authorized admissions*.

Koszewnik was Director, North American Diesel.  "He was the director of the entire North American Diesel program at Ford."  As such, he "was the guy for sorting out the issues on the 6.0 liter diesel engine . . . ."  It was "his job" to bring down fuel injector failure rates and to bring down warranty spending.  That specifically included getting approval for quality improvement, which was the topic of Exhibit 45.  This evidence showed that it was within the scope of his employment to discuss problems with the 6.0L engine and warranty repairs to it, as he did in Exhibits 45, 54, 61, 64, and 162.

Freese was Chief Engineer, Diesel Engines.  He was "in charge of testing prototype engines that have been supplied by Navistar."  He and his team tested the prototype of the 6.0L engine.  In sending Exhibit 39, he was "doing his job."[9]  This

---

[9]     In one email that was part of Exhibit 39, Freese noted that the turbocharger of a test vehicle had failed.  In the trial court, Ford's counsel conceded, "I will give you that when the head of diesel engineering sends an e-mail recording a test result, yeah, that might come in . . . ."

showed that it was within the scope of his employment to make statements to other Ford employees about problems with the engine, as he did in Exhibits 39 and 41. It also showed that his second-level hearsay statements about EGR valves, as set forth in Exhibit 64, were within the scope of his employment.

Frommann was a Warranty Program Manager for powertrains purchased from other manufacturers. He was the liaison with Ford's "technical publications group . . . to screen communications between or help facilitate more efficient service fixes to dealers." Thus, it was within the scope of his employment to tell other Ford employees, as he did in Exhibit 65, that the engine had exceeded Ford's own cylinder pressure specifications, and that this information should not be published.

Ligon was Director of the Customer Service Division. He was "very high-ranking," a "management team member[]." At Ford, a director is an "E bander," which means that he or she has an executive position.

In Exhibit 47, Ligon discussed "concerns" about the engine and Ford's lack of a "definitive repair action." In Exhibit 189, he discussed replacing fuel injectors to avert buybacks and added, "[T]here are no fixes on certain symptoms." As he was in upper management, both emails were well within the very broad scope of his employment.

Berardi was a Tough Truck Service Engineering Manager. He participated in roundtables with dealers, shortly after the launch of the 6.0L engine, to gather information about problems with it. In Exhibit 48, he proposed ways to reduce buybacks. It is inferable that he was authorized, not only to gather information about problems with

the 6.0L engine, but also to suggest what Ford should do based on that information.**10** While the opposite inference is also possible, we must accept the one that supports the trial court's ruling. (*Carian v. Department of Fish & Wildlife* (2015) 235 Cal.App.4th 806, 815.)

Freeland worked in engine research. He testified that he gave a PowerPoint presentation (inferably Exhibit 62) to Koszewnik and others. As Koszewnik was a high-ranking director, the fact that he sat through the presentation was sufficient to show that it was within the scope of Freeland's authority to give it.

Samardzich was "[D]irector of [T]ruck in [P]roduct [D]evelopment." As such, she was on the "executive management team." Indeed, she was Koszewnik's supervisor. This gave her ample authority to prepare Exhibit 63, listing "the top 6.0 issues."

Johnston was a Product Concern Engineer. He monitored summaries of dealerships' calls to Ford's technical hotline; if he saw a particular problem trending, he would work with others to resolve it. In Exhibit 188, he relayed information from Wilde about the role of turbochargers in "repeat 6.0L driveability concerns." Thus, Exhibit 188 concerned a matter within the scope of his authority.

---

**10** In the trial court, Ford's counsel conceded, "In many cases you do have people who are responsible for troubleshooting problems on 6.0 liter diesels writing e-mails about troubleshooting problems on a 6.0 liter diesels. Those were authorized, and I'll give you that."

Wilde was a Reacquired Vehicle Technical Specialist. There was no evidence of the scope of his authority. However, because Johnston adopted his statements, they became an adoptive admission. (Evid. Code, § 1221.)

In sum, then, we conclude that the trial court did not abuse its discretion by admitting Exhibits 39, 41, 45, 47, 48, 54, 61, 62, 63, 64, 65, 162, 188, and 189.

ii. *Documents not admissible as authorized admissions*.

By contrast, Exhibit 42, saying that the launch of the 6.0L engine was "not going well," was sent by Henderson. The evidence showed only that his title was Power Train Purchasing Manager. There was no evidence of his "usual and customary authority [or] the nature of the statement in relation to that authority . . . ." (*O'Mary v. Mitsubishi Electronics America, Inc.*, *supra*, 59 Cal.App.4th at p. 570.)

We recognize that he was responding to an email from another Ford employee, Ted Betley, who had asked him for help on working with Navistar to reduce warranty claims. But Betley's email, too, was hearsay; it was not admissible to prove the truth of its implied assertions about Henderson's authority.

Similarly, Exhibit 55, listing major warranty issues with the 6.0L engine, was sent by Williams. The only evidence about him was that at some point (not necessarily when he sent the email), he was a Resident Powertrain Engineer in a Ford plant that produced trucks. There was no evidence of his job duties, his place in the Ford hierarchy, or his corporate relationship with the addressees. Thus, there was no evidence that it was within the scope of his authority to send the email.

Eeley was a Six Sigma Black Belt. He monitored calls to the hotline to identify problem vehicles and to help technicians fix them so they would not become buybacks. In Exhibit 160, he complained to Koszewnik about a phone call he had had with Ligon, in which Ligon pressured him to say the 6.0L engine was "crap." There was no evidence about the corporate relationship between Eeley and Koszewnik or between Eeley and Ligon. Thus, there was no evidence that it was part of Eeley's job duties to relay what was said in the phone call to Koszewnik.

Last but not least, Exhibits 43 and 198 had no known author whatsoever. We may assume, without deciding, that they were adequately authenticated as documents maintained by Ford. Even if so, however, that falls short of showing that their unknown authors created them while acting within the scope of their authority. Indeed, it falls short of showing that they were created by Ford employees at all.

In sum, again, we conclude that Exhibits 42, 43, 45, 160, and 198 were not admissible as authorized admissions.

They were admissible, however, as nonhearsay evidence that the Ford employees who received them had knowledge of the problems discussed in these exhibits. (See *People v. Thornton* (2007) 41 Cal.4th 391, 446-447.) They were also admissible under the state of mind exception to show that the authors (when shown to be Ford employees) had knowledge of these same problems. (Evid. Code, § 1250, subd. (a).) This knowledge had to be imputed to Ford; thus, it supported the Bowsers' fraudulent

39

disclosure claim.  (See *Roche v. Hyde* (2020) 51 Cal.App.5th 757, 797-803 [principal could be liable for nondisclosure of information known to his agent].)

Assuming these documents were not admissible under some other hearsay exception, they could not be used to show that the problems they described actually existed.  (Evid. Code, §§ 1200, 1250, subd. (b).)  However, there was ample other evidence of that, including the admissible documents, the Shams and Fascetti declarations, and Blasjo's expert testimony.  Accordingly, even if their admission as evidence of their truth, without any limiting instruction, was error, it was harmless.

IV

THE DEPOSITIONS OF FORD EMPLOYEES AS HEARSAY

Ford contends that the trial court erred by admitting depositions of four current and former Ford employees that had been taken in the class action.

A.      *Additional Factual and Procedural Background*.

Ford filed a motion in limine to exclude the depositions of current and former Ford employees, including those of Eeley, Freeland, Frommann, and Ligon taken in the class action.  It argued that they were hearsay and that they were not within the former testimony exception because Ford had not had a similar "interest and motive" in cross-examination.  (See Evid. Code, § 1291.)

The Bowsers responded that the depositions were admissible on multiple grounds, including (1) under the former testimony exception, because Ford had had a similar interest and motive in cross-examination, and (2) under Code of Civil Procedure section

2025.620, subdivision (g) (section 2025.620(g)), which provides for the admission of a deposition in a subsequent action between the same parties.

The trial court ruled that the depositions were admissible under the former testimony exception  and also under section 2025.620(g)  Accordingly, the Eeley, Freeland, Frommann, and Ligon depositions were played for the jury.

In its motion for new trial Ford argued again that the trial court had erred by admitting the depositions.  The trial court denied the motion.

B.      *Discussion*.

1.      *Code of Civil Procedure section 2025.620, subdivision (g)*.

Section 2025.620(g) says:  "When an action has been brought in any court of the United States or of any state, and another action involving the same subject matter is subsequently brought between the same parties or their representatives or successors in interest, all depositions lawfully taken and duly filed in the initial action may be used in the subsequent action as if originally taken in that subsequent action."

We have not found any cases dealing with whether a class action and a subsequent action by a member of the class are "between the same parties" for this purpose.  However, "a nonnamed class member generally 'is [not] a party to the class-action litigation *before the class is certified*' . . . . [Citation.]"  (*In re Hall* (6th Cir. 2021) 4 F.4th 376, 379.)  "'[A] class action, when filed, includes only the claims of the named plaintiff.' [Citation.]"  (*Moser v. Benefytt, Inc.* (9th Cir. 2021) 8 F.4th 872, 877.)

41

"Without . . . certification and identification of the class, [an] action is not properly a class action. [Citation.]" (*Baxter v. Palmigiano* (1976) 425 U.S. 308, 310, fn. 1.)

In *Smith v. Bayer Corp.* (2011) 564 U.S. 299 (*Smith*), the United States Supreme Court held that an unnamed member of a class that was never certified is not a party to the class action — at least, not for purposes of res judicata. (*Id.* at pp. 312-318.) It said: "In general, '[a] "party" to litigation is "[o]ne by or against whom a lawsuit is brought,"' [citation], or one who 'become[s] a party by intervention, substitution, or third-party practice,' [citation]. And we have further held that an unnamed member of a *certified* class may be 'considered a "party" for the [particular] purpos[e] of appealing' an adverse judgment. [Citation.] But . . . no one in that case was 'willing to advance the novel and *surely erroneous* argument that a nonnamed class member is a party to the class-action litigation *before the class is certified*.' [Citation.]" (*Smith*, *supra*, at p. 313, second italics added.)

Federal appellate courts have extended *Smith* beyond its res judicata context. For example, *North Sound Capital LLC v. Merck & Co., Inc.* (3d Cir. 2019) 938 F.3d 482 cited *Smith* in holding that, for purposes of the Securities Litigation Uniform Standards Act, "an unnamed class member is not 'a party to the class-action litigation before the class is certified.' [Citation.]" (*North Sound Capital LLC v. Merck & Co., Inc., supra,* at p. 492.) Likewise, *Molock v. Whole Foods Market Group, Inc.* (D.C. Cir. 2020) 952 F.3d 293 cited *Smith* in holding that an unnamed class member is not a party to a class action for purposes of personal jurisdiction. (*Id.* at pp. 297-298.) It said: "[I]n *certified* class

actions, '[n]onnamed class members . . . may be parties for some purposes and not for others.' [Citation.]" (*Id*. at p. 297.) "By contrast, putative class members . . . are *always* treated as nonparties." (*Ibid*.)

*Smith* is controlling regarding the parties to a federal class action. In any event, California courts follow *Smith*. (*Williams v. U.S. Bancorp Investments, Inc.* (2020) 50 Cal.App.5th 111, 121 ["To the extent California law differs, it is even stricter than federal law in requiring formal intervention before an absent class member may be considered a party."]; *Bridgeford v. Pacific Health Corp.* (2012) 202 Cal.App.4th 1034, 1037.)

We therefore conclude that the depositions were not taken in an action "between the same parties" as this action. Hence, they were not admissible under section 2025.620(g).

### 2. *The former testimony exception*.

Under Evidence Code section 1291, subdivision (a)(2), "[e]vidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] . . . The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant *with an interest and motive similar to that which he has at the hearing*." (Italics added.)

The definition of "former testimony" includes "[a] deposition taken in compliance with law in another action . . . ." (Evid. Code, § 1290, subd. (c).)

43

The Bowsers asserted that the deponents were unavailable because they all lived out-of-state.  (See Code Civ. Proc., § 1989.)  In any event, Ford did not object to the depositions on the ground that the deponents were available.  Thus, it forfeited this argument.  (Evid. Code, § 353, subd. (a).)

The parties' arguments center on the fact that the former testimony here was given in depositions, rather than at trial.  Ford argues that it necessarily had different interests and motives in questioning a Ford-affiliated witness at a deposition than at trial.

While this appeal was pending, the California Supreme Court addressed this issue in *Berroteran v. Superior Court* (2022) 12 Cal.5th 867 (*Berroteran*).  It would be hard to distinguish *Berroteran*, as it involved the admissibility of depositions of Ford employees — including depositions taken in the class action — in a subsequent action against Ford alleging that the 6.0L engine was defective.  (*Id.* at pp. 877-879, 878, fn. 2.)

The Supreme Court noted that "[t]he interest and motive of an opposing party at a discovery deposition is . . . often *against* cross-examination of the witness, in order to avoid assisting the deposing party.  [Citation.]"  (*Berroteran*, *supra*, 12 Cal.5th at p. 892.)  "[H]owever, . . . cross-examination *may* be appropriate when a deposition serves 'to preserve the testimony of a deponent who either will not or may not be available at trial'  [citation]."  (*Id.* at p. 894.)

The court relied on an official comment to Evidence Code section 1291, subdivision (a)(2), which "" . . . articulates . . . a general rule against admission at trial, by way of that statute's hearsay exception, of prior testimony from a typical discovery

44

deposition. But it remains merely a general rule — that is, an approach to be adopted in the absence of persuasive evidence that the deposition testimony sought to be admitted satisfies the requirements of section 1291(a)(2). The party seeking admission of prior deposition testimony under that provision is free to submit evidence to the court that the deposition sought to be introduced, unlike a typical discovery deposition, featured circumstances that provided the party opponent with an interest and motive for cross-examination similar to that at trial." (*Berroteran*, *supra*, 12 Cal.5th at pp. 894-895.)

*Berroteran* therefore approved of this court's previous opinion in *Wahlgren v. Coleco Industries, Inc.* (1984) 151 Cal.App.3d 543 (*Wahlgren*). It described *Wahlgren* as similarly "articulating a *general rule* against the use of discovery depositions such as were at issue in that case (of witnesses aligned with the defendant) in a subsequent proceeding — unless the proponent can show that the requirements of the statute, as illuminated by the Legislature's official comment, are met." (*Berroteran*, *supra*, 12 Cal.5th at p. 888.)

*Berroteran* proceeded to elaborate on *Wahlgren*, however, by listing factors that a trial court should consider in deciding whether a party had "similar interests and motives" in cross-examining a deponent affiliated with that party:

"(A.) . . . [W]hether the parties intended, at the outset, that the deposition serve as trial testimony. . . .

"(B.) . . . [W] hether the parties subsequently reached agreement concerning use of the deposition at trial in that case, or in other cases. . . .

45

"(C.)  Key 'practical considerations[]' . . . , including . . . :

"(1.)  The timing of the deposition within the context of the litigation, and special circumstances creating an incentive for cross-examination. . . .

"(2.)  The relationship of the deponent and the opposing party. . . .

"(3.)  The anticipated availability of the deponent at trial in the proceeding in which the deposition was taken, and the statutory context. . . .

"(4.)  Conduct at, and surrounding, the deposition — and the degree of any examination conducted by the opposing party. . . .

"(5.)  The particular designated testimony. . . .

"(6.)  "Similarity of position.' . . ."  (*Berroteran*, *supra*, 12 Cal.5th at pp. 900-904, italics omitted.)

This list of "practical considerations" was not exclusive.  (*Berroteran*, *supra*, 12 Cal.5th at p. 901.)

Here, the parties cited and discussed *Wahlgren*.  Plainly, the trial court was aware of it.  Nevertheless, it admitted the depositions.  Thus, it must have found that the particular circumstances of the depositions showed that Ford had similar interests and motives in cross-examination.  Even though *Berroteran* had not yet been decided, the factors listed in *Berroteran* were logically relevant to that decision.  Thus, Ford has *not* asked that we remand the case so the trial court can reconsider the admissibility of the depositions in light of the *Berroteran* factors.  Rather, we consider whether its decision was an abuse of discretion under *Berroteran*.

46

The depositions here were taken in Florida and Michigan for use in an action then pending in Illinois. It is a reasonable inference that Ford knew that the deponents would be unavailable at trial, and it had to cross-examine them then and there, if at all. (See Fed. Rules Civ. Proc., rule 45(c)(1).) Of course, Eeley and Frommann were then-current Ford employees. It could be argued that Ford expected to be able to order them to appear at trial if it did need to cross-examine them. However, Ford could not order Freeland and Ligon, who were former employees, to appear at trial. Moreover, it could not be sure that Eeley and Frommann would *remain* current employees.

In addition, the depositions were taken in a class action involving alleged defects of the 6.0L engine. It was reasonably inferable that the class was relatively large, a substantial number of class members would opt out, and more than a handful of opt-outs would file their own separate actions against Ford. This was true even if (as Ford claims) it expected the class action itself to be settled. If Ford could develop favorable testimony through cross-examination, that could help to head off such actions or to settle them; at a minimum, it could reduce costs by eliminating duplicative discovery.

Finally, the depositions were videotaped. *Berroteran* said: "Standing alone, the videotaping of a deposition may not trigger a motive and interest to cross-examine, although *it may be a relevant factor in combination with other circumstances*." (*Berroteran*, *supra*, 12 Cal.5th at p. 897, italics added.) Here, the trial court could reasonably view the fact that the depositions were videotaped as corroborating the inference that Ford expected them to be used in opt-out actions.

Admittedly, the fact that Ford did not actually cross-examine the deponents cuts against the trial court's conclusion. Crucially, however, the applicable standard of review is abuse of discretion. (*People v. King* (1969) 269 Cal.App.2d 40, 48.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.]" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) Given the risk that these particular witnesses would be unavailable to Ford at trial, plus the likely benefit to Ford of any favorable testimony by them, the trial court could reasonably conclude that Ford had a similar interest and motive to cross-examine them as it did at trial.

V

EVIDENCE SUPPORTING THE DAMAGES AWARD ON THE FRAUD CLAIMS

Ford contends that the amount of the jury's award of damages on the fraud claims is not supported by the evidence.

A.    *Additional Factual and Procedural Background.*

In its special verdicts on the fraud claims, the jury found:

"9. What are the Plaintiffs' damages?

"a. The actual amount Plaintiffs paid for the vehicle: $43,084.68

"b. The fair market value of the vehicle received by Plaintiffs at the time of purchase: $43,084.68

48

"c. The difference between the actual amount Plaintiffs paid for the vehicle and the fair market value of the vehicle received by Plaintiffs at the time of purchase. (Subtract the amount entered in Section 'b' from the amount entered in Section 'a'): Ø

"d. Amounts reasonably spent in reliance on the representation(s), if those amounts would not otherwise have been spent: $43,084.68

"TOTAL DAMAGES (Add the above amount entered in Section 'c.' from the above amount entered in Section 'd.'): $43,084.68"

In its motion for JNOV, Ford argued that the compensatory damages for fraud were not supported by the evidence. The trial court denied the motion. It said: "CACI 1923 and 1907 clearly set forth the parameters of how the jury could weigh the evidence, and there is nothing in the verdict that supports a contrary finding. [¶] . . . [S]ubstantial evidence exists to show that Plaintiffs suffered compensatory damages . . . ."

Ford raised the same argument in its motion for new trial. The trial court denied the motion. It said only: "The Court does not find that the amount of damages is excessive or improper . . . . Indeed, the Court finds that the jury award comports reasonably with the damages it could have awarded . . . ."

B. *Discussion*.

"One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which [they] parted and the actual value of that which [they] received, together with any additional damage arising from the particular transaction . . . ." (Civ. Code, § 3343, subd. (a).) "[A]dditional damages" may

49

include, among other things, "[a]mounts actually and reasonably expended in reliance upon the fraud." (Civ. Code, § 3343, subd. (a)(1).) This is often called the "'out-of-pocket' rule." (E.g., *Stout v. Turney* (1978) 22 Cal.3d 718, 725.) The jury was instructed accordingly. (CACI No. 1923.)

Ford argues that the jury found that the price of the truck was equal to the market value of the truck, and that the Bowsers cannot recover the price of the truck as either "additional damages" (the wording of the statute) or "[a]mounts . . . spent in reliance" (the wording of the special verdict form); therefore, the Bowsers had no damages at all. The Bowsers retort that they *can* recover the price of the truck as "additional damages" or as "[a]mounts . . . spent in reliance."

"The provisions of section 3343 to the effect that the defrauded person may also recover any 'additional damage' arising from the particular transaction . . . do not indicate that any other *measure of damages* may be applied. The right to recover *additional* damages does not refer to the *measure* of damages, but, rather, to such matters as expenses or other consequential injury resulting from the fraud. [Citations.]" (*Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744, 762-763.)

Where a seller induces a purchase by fraud, but the market value of the property is equal to the price, the out-of-pocket rule prohibits the buyer from recovering the purchase price. If the buyer could nevertheless recover the purchase price as an amount spent in reliance, that would gut the rule.

The Bowsers cite no case holding that, in that situation, the buyer may recover the purchase price as reliance damages. Instead, they cite *F.T.C. v. Figgie Int'l, Inc.* (9th Cir. 1993) 994 F.2d 595 (*Figgie*), cert. den. (1994) 510 U.S. 1110. There, the defendant had made misleading representations to the public about its heat detectors. (*Id*. at pp. 598-600.) The trial court found that the value of the heat detectors was "'de minimis.'" (*Id*. at p. 601.) Based on the Federal Trade Commission Act,[11] it ordered the defendant to refund the full purchase price of the heat detectors to all consumers who made claims. (*Ibid*.)

On appeal, the defendant argued that the value of the heat detectors was not de minimis. The appellate court agreed, but it held the error harmless. (*Figgie*, *supra*, 994 F.2d at p. 606.) It said, "Courts have previously rejected the contention 'that restitution is available only when the goods purchased are essentially worthless.' [Citation.]" (*Ibid*.) It offered the following analogy: "Customers who purchased rhinestones sold as diamonds should have the opportunity to get all of their money back. We would not limit their recovery to the difference between what they paid and a fair price for rhinestones. The seller's misrepresentations tainted the customers' purchasing decisions. If they had been told the truth, perhaps they would not have bought rhinestones at all or only some.

---

[11] The relevant statute provided: "The court . . . shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers . . . resulting from the rule violation or the unfair or deceptive act or practice . . . . Such relief may include, but shall not be limited to, rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair or deceptive act or practice . . . ." (15 U.S.C. § 57b, subd. (b).)

. . . The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each detector that is not useful to them." (*Ibid*.)

*Figgie* does not apply here, for two reasons. The first is rather obvious: It was based on a statute that was very different from Civil Code section 3343, subdivision (a). The statute there specifically provided not only for "damages" but also for a "refund" and "rescission," as well as "such relief as the court finds necessary." (15 U.S.C. § 57b, subd. (b), *supra*.) The second, somewhat more subtle, is that the *Figgie* court's diamond/rhinestone hypothetical used essentially restitutionary reasoning. Here, the Bowsers could have requested rescission; in that case, they could have recovered the full purchase price, but in return, they would have had to compensate Ford for the value of their use of the truck. (*Gentry v. Kelley Kar Co.* (1961) 193 Cal.App.2d 324, 337.) They elected damages instead. As a result, their recovery became subject to Civil Code section 3343, subdivision (a).

We therefore conclude that we cannot uphold the award of $43,084.68 in damages on the theory that it represents "additional damages" within the meaning of Civil Code section 3343, subdivision (a). That does not mean, however, that we cannot uphold it at all.

Both sides sedulously ignore the real problem — seemingly inconsistent verdicts. The jury's award of the full purchase price of the truck would seem inconsistent with its finding that the purchase price was equal to the market value. The normal appellate remedy for a genuinely inconsistent verdict is reversal and retrial. (*Woodcock v. Fontana*

*Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 457.) Understandably, Ford would prefer that we simply strike the award of compensatory damages — and the accompanying punitive damages award. Just as understandably, the Bowsers would prefer that we simply affirm. However, we cannot blind ourselves to this glaring issue.

"Litigants should not be made to suffer for the blunder of a jury in returning an uncertain verdict, and in most instances they will not. . . . Construction may resolve many uncertainties [citation]." (7 Witkin, Cal. Procedure (6th ed. 2021) Trial, § 369, p. 320.) "[A]n appellate court will interpret the verdict if it is possible to give a correct interpretation. [Citations.]" (*Woodcock v. Fontana Scaffolding & Equipment Co.*, *supra*, 69 Cal.2d at p. 457.) We "' . . . interpret the verdict from its language considered in connection with the pleadings, evidence and instructions.' [Citations.]" (*Id.* at pp. 456-457.) "Where special verdicts appear inconsistent, if any conclusions could be drawn which would explain the apparent conflict, the jury will be deemed to have drawn them. [Citation.]" (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424.) "The standard of review for inconsistency in a special verdict is de novo. [Citation.]" (*Trejo v. Johnson & Johnson* (2017) 13 Cal.App.5th 110, 124, fn. omitted.)

What is critical is that the special verdict form required the jury to determine the market value of the truck "at the time of purchase." That was not necessarily a correct statement of the law. Under some circumstances, "the actual value" that a defrauded buyer received is not measured by market value at the time of purchase.

"The unqualified language of section 3343 indicates that the plaintiff should receive as damages the difference in value between everything with which he parted and everything he received, and the statute contains nothing to show that the difference must be calculated solely on the basis of the facts existing at the time the contract was made or performed. The section must be applied realistically so as to give the defrauded person his actual out-of-pocket loss, and, where necessary to reach that result, the court must consider subsequent circumstances." (*Garrett v. Perry* (1959) 53 Cal.2d 178, 184; accord, *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 145.)

In *Feckenscher v. Gamble* (1938) 12 Cal.2d 482, the defendants fraudulently induced the plaintiff to do a real property exchange. (*Id.* at pp. 492-495.) The plaintiff gave one of the defendants property in Pasadena and Michigan worth a total of $13,700. (*Id.* at pp. 488, 500; see also *id.* at pp. 489-490.) She received a piece of property in Los Angeles, which was subject to a mortgage. (*Id.* at pp. 487, 490.) The Los Angeles property turned out to be less profitable than the defendants had represented it to be; as a result, it was foreclosed on and sold. (*Id.* at p. 491.) The trial court awarded damages based on the benefit of the bargain: $17,760, representing the value of the Los Angeles property as represented ($47,000), minus its actual value at the time of the sale (evidently $29,240). (*Id.* at p. 499.)

The Supreme Court held that this was error, because the out-of-pocket rule applied. (*Feckenscher v. Gamble*, *supra*, 12 Cal.2d at pp. 499-500.) It further held that,

54

as a matter of law, the plaintiff's damages were $13,700 — the full value of the properties she gave, with no offset for the property she received. It explained: "Although there was some equity in the property which plaintiff acquired in the trade at the time she actually acquired it, yet by reason of one of the misrepresentations made to her to the effect that the trust deed was not immediately due, she lost the entire property by a sale under the trust deed, so that it can reasonably be said that she actually received nothing of value from the transaction." (*Id*. at p. 500; accord, *Garrett v. Perry*, *supra*, 53 Cal.2d at pp. 182-183; *Ford v. Cournale* (1973) 36 Cal.App.3d 172, 183-184; *Burkhouse v. Phillips* (1971) 18 Cal.App.3d 661, 665-666; *Hahn v. Food Service Equipment Co.* (1963) 220 Cal.App.2d 412, 416.)

A more recent case to similar effect is *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835. There, the defendant fraudulently induced the plaintiffs to buy the promissory notes of a corporation that eventually went belly up. (*Id*. at pp. 846-855.) A jury awarded the plaintiffs "essentially . . . the total amount they had paid for the . . . notes . . . ." (*Id*. at p. 876.) On appeal, the defendant argued "that no evidence support[ed] the jury's implied finding that the . . . notes were worthless when [the plaintiffs] purchased them." (*Ibid*.)

The appellate court held that "the final value placed on the notes by the market — that is, no value at all — is properly viewed as their actual value when purchased by respondents. [Citation.]" (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*, *supra*, 157 Cal.App.4th at p. 876.) It noted a witness's testimony that the

55

notes were worthless when sold, "and their positive market price only reflected the public's ignorance of [the corporation's] dire condition." (*Ibid.*) Another witness had testified that the corporation "was 'dying or dead' when the . . . notes were issued." (*Ibid.*) "[T]he jury could properly have concluded that the . . . notes were *always* worthless — in the sense that there was never an appreciable chance that they would be repaid — and thus . . . valueless when purchased." (*Ibid.*)

Here, the jury was instructed:

"'Fair market value' is the highest price that a willing buyer would have paid on the date of the transaction to a willing seller, assuming:

"1. That there is no pressure on either one to buy or sell; and

"2. That the buyer and seller know all the uses and purposes for which the vehicle is reasonably capable of being used." (CACI No. 1923.)

Significantly, it was *not* instructed that fair market value assumes the buyer and seller "" . . . both hav[e] full knowledge of *all pertinent facts*."' [Citation.]" (*Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1274, italics added.)

Ford introduced evidence that, at the time of the purchase, the market value of the truck was equal to the purchase price.

Blasjo conceded that "not all 6.0 liter diesel engines are problematic . . . [.]" "There are those that don't have problems." He was "not saying that there's a fundamental problem in the blueprint of the engine such that every vehicle has the same

problems." The Bowsers' particular truck had problems — e.g., problems with the electrical system — that were not related to the engine at all.

Kuhn testified that manufacturers offer a warranty because "you'll never have a 100 percent reliable population of vehicles . . . . You will always have some portion of the population that's going to require some repairs . . . [Y]ou don't know which ones, you don't know which issues . . . ." With respect to the 6.0L engine in 2006 model year vehicles, National Highway Traffic and Safety Administration (NHTSA) received only 0.41 complaints per thousand vehicles.

Finally, Blasjo testified that the problems that the Bowsers had with the truck reduced its value, allowing the inference that it was worth full value before.

Against the backdrop of the law, the instructions, and the evidence, the jury's verdict becomes clear. In determining "market value," it was limited to the moment of the purchase; it was also prevented from assuming that the hypothetical buyer and seller had full knowledge of the *actual* defects of the Bowsers' truck and/or of the 6.0L engine. In general, in December 2005, a Ford F-250 Super Duty truck with a 6.0L engine could be put to the same "uses and purposes" as any new pickup truck. Moreover, in December 2005, actual buyers were willing to pay the full retail price for such a truck. The jury therefore concluded that the purchase price of the truck was its fair market value.

However, the jury also concluded that, as of December 2005 — if "all pertinent facts" were known, including the "subsequent circumstance" that the truck broke down frighteningly and unpredictably and eventually became undrivable — the truck was

worthless. If the jury had been properly instructed, it would have found that the fair market value at the time of purchase was zero. Because it was not properly instructed, it made essentially the same finding the only way it could: It found that the Bowsers reasonably spent $43,084.68 in reliance on the false representations and otherwise would have spent zero.

The special verdicts, as thus construed, are consistent with the law, consistent with the instructions, and consistent with each other.

## VI

## INCONSISTENT COMPENSATORY DAMAGES AWARDS

Ford contends that the compensatory damages awards on the fraud claims and on the Song-Beverly claim are inconsistent.

A.    *Additional Factual and Procedural Background*.

As mentioned, on each of the fraud claims, the jury awarded $43,084.68 — the purchase price — as the "[a]mount[] reasonably spent in reliance on the representation(s)."

On the Song-Beverly claim, it awarded $1,282.42 — the November 2011 repair cost — as "[i]ncidental damages."

B.    *Discussion*.

Ford did not raise this issue below. However, a claim that a jury verdict is inconsistent can be raised for the first time on appeal. (*Trejo v. Johnson & Johnson*,

*supra*, 13 Cal.App.5th at p. 123, fn. 4; *Godfrey v. Steinpress* (1982) 128 Cal.App.3d 154, 187.)

Once again (see part V.B, *ante*), if any conclusions could be drawn that would explain the apparent conflict, we must deem the jury to have drawn them. (*Wysinger v. Automobile Club of Southern California*, *supra*, 157 Cal.App.4th at p. 424.)

The jury was instructed that, on the Song-Beverly claim, the Bowsers could recover their "repair expenses," provided they proved, among other things, that Ford's "breach of warranty was a substantial factor in causing the expenses."

It was also instructed that, on the fraud claims, they could recover "amounts that they reasonably spent in reliance on [Ford's] false representation or failure to disclose, if those amounts would not otherwise have been spent."

Evidently the jury found that the Bowsers incurred repair costs as a result of Ford's breach of warranty, but that they did not incur those costs in reliance on Ford's fraud. There is nothing inconsistent about these two separate implied findings.

Ford characterizes the $1,282.42 awarded as incidental damages under the Song-Beverly Act as "reliance damages." Reliance, however, was not required — only causation.

Ford also notes that in closing argument, the Bowsers' counsel asked the jury to award the costs of repair on both the fraud claims and Song-Beverly claim. The mere fact that they were asking for repair costs on the fraud cause of action does not establish

that those costs were, in fact, incurred in reliance on the fraud. The jury could reasonably find otherwise.

## VII

## "MIXING AND MATCHING" ELEMENTS OF DAMAGES

Ford contends that the Bowsers cannot elect to recover compensatory damages under the Song-Beverly Act, yet still recover punitive damages for fraud. Ford raised this contention below in its motion for JNOV.

Ford argues that the Bowsers made an "election of remedies." "The doctrine of election of remedies ""has been generally limited to a choice by a party between inconsistent remedial rights, the assertion of one being necessarily repugnant to or a repudiation of the other.' [Citation.]" [Citation.]' [Citation.]" (*City of Orange v. San Diego County Employees Retirement Assn.* (2002) 103 Cal.App.4th 45, 59.)

"[I]n order to sustain a theory of irrevocable election it must be shown that the two remedies are inconsistent and repugnant and that by the exercise of both the defendant would suffer unconscionable, unfair and unjust detriment." (*Baumann v. Harrison* (1941) 46 Cal.App.2d 84, 88.) "[W]here the law affords distinct, but not inconsistent, remedies, the election to follow one does not operate as a waiver of the other. [Citation.]" (*Crittenden v. St. Hill* (1917) 34 Cal.App. 107, 110.)

The classic case of an election of remedies arises when the plaintiff is entitled to either damages or rescission for breach of contract or fraud. Damages require the plaintiff to affirm the contract; rescission requires the plaintiff to disaffirm it. (See

generally *Wong v. Stoler* (2015) 237 Cal.App.4th 1375, 1384-1385.)  Likewise, a plaintiff cannot recover a permanent injunction against a nuisance yet also recover anticipated future damages from the nuisance.  (*Spaulding v. Cameron* (1952) 38 Cal.2d 265, 266-270.)  Other examples of the doctrine, as given by Witkin, similarly involve a logical inconsistency.  (3 Witkin, Cal. Procedure (6th ed. 2021) Actions § 191 at pp. 263-264.)

The Bowsers' Song-Beverly claim was not inconsistent with their fraud claims. Ford could (and, the jury found, did) both (1) misrepresent or fail to disclose material facts about the truck and (2) fail to repair or repurchase the truck.  "'That a given set of facts fortuitously supports liability on two legal theories is not a principled reason to deny a party the right to pursue each theory.'  [Citation.]"  (*County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 310.)

The applicable doctrine is not election of remedies but the rule against a double recovery.[12]  The Bowsers had to make an election because their damages for fraud overlapped their damages under the Song-Beverly Act.  Specifically, on the fraud claims, the jury awarded them the purchase price of the truck, minus its fair market value; on the

---

[12]     Some cases say that an "election of remedies" is required when there would otherwise be a double recovery.  (E.g., *De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890, 907.)

Other cases, however, recognize that an "election of remedies" necessitated by a double recovery is a different critter than an "election of remedies" necessitated by inconsistent or contradictory factual underpinnings.  (E.g., *Wilkins v. Peninsula Motor Cars, Inc.* (2003) 266 Va. 558, 560-561 ["The genus of election of remedies has many species."].) For clarity, we think it is better to avoid using the term "election of remedies" when the real issue is preventing a double recovery.

61

Song-Beverly claim, it awarded them the purchase price of the truck, minus the value of its use prior to the discovery of the nonconformity. Accordingly, they could properly be required to elect between their Song-Beverly compensatory damages and their fraud compensatory damages. They chose Song-Beverly damages.

This does not mean, however, that they did *not* recover compensatory damages for fraud. Rather, their compensatory damages *represent* a recovery *both* under the Song-Beverly Act *and* for fraud. Normally, in a double recovery situation, the plaintiff will choose the larger amount. In that event, the larger award *embraces* the smaller award. Here, the Bowsers chose the smaller award — presumably because they were afraid of losing their right to attorney fees under the Song-Beverly Act. Nevertheless, the smaller recovery is still on both theories. Thus, it carries with it both the right to attorney fees and the right to punitive damages. To put it another way, the prospect of a double recovery requires the plaintiff to elect only between amounts that are duplicative, not those that are not.

*Miller v. United Automax* (Tenn. 2005) 166 S.W.3d 692 (*Miller*) is all but on point. There, the defendant allegedly sold the plaintiffs a used car without disclosing the fact that it had previously been "wrecked." (*Id*. at pp. 694-695.) A jury found for the plaintiffs on a claim under the Tennessee Consumer Protection Act (TCPA) and on a claim for common-law fraud. (*Ibid*.) On each cause of action, it found that the plaintiffs' compensatory damages were $899.50. (*Ibid*.) On the fraud claim, it awarded $3,000 in punitive damages. (*Id*. at p. 695.) On the TCPA claim, the plaintiffs were entitled to

62

treble damages and attorney fees. They elected to receive the punitive damages ($3,000) rather than treble damages ($2,698.50). At the same time, however they attempted to reserve their right to attorney fees. (*Ibid*.) The trial court ruled that, because they had elected punitive damages for fraud, they could not recover attorney fees under the TCPA. (*Id*. at pp. 695-696.)

The Tennessee Supreme Court reversed. It agreed with the plaintiffs that "they are entitled to both punitive damages and attorney's fees because the two remedies are not inconsistent with each other nor do they provide double redress for a single wrong. . . . [T]he only election that needed to be made was between the award of treble damages and punitive damages, and not between the entire elements and remedies of each theory of recovery." (*Miller*, *supra*, 166 S.W.3d at p. 696.) "Unlike an award of treble damages under the [TCPA], attorney's fees are not punitive in nature. 'The potential award of attorney's fees under the [TCPA] is intended to make prosecution of such claims economically viable to plaintiff.' [Citation.] On the other hand, punitive damages are designed to punish wrongful conduct and to deter others from such conduct in the future. [Citation.] Because the purpose of the attorney's fees and costs provision is different from the purpose of punitive damages, an award of attorney's fees and costs under the [TCPA] is not duplicative of punitive damages." (*Ibid*.) "[T]he election of remedies doctrine serves only to prevent double redress for a single wrong. [Citation.] The election is not, as Defendant suggests, between the two separate verdicts, but only between those parts of the recovery that are duplicative. Therefore, while Plaintiffs may

63

not recover both punitive damages and treble damages, they may recover both punitive damages and attorney's fees." (*Id.* at pp. 697-698.)

Similarly, in *Wilkins v. Peninsula Motor Cars, Inc.*, *supra*, 266 Va. 558 (*Wilkins*), the defendant sold the plaintiff a used car, misrepresenting it as new. (*Id.* at p. 560.) The plaintiff asserted claims for fraud and for violation of the Virginia Consumer Protection Act (VCPA). (*Id.* at pp. 559-560.) On the fraud claim, a jury awarded him $1,862.86 in compensatory damages and $100,000 in punitive damages. On the VCPA, it awarded him treble damages totaling $12,000, and the trial court awarded him attorney fees and costs of $34,183. (*Id.* at p. 559.) The trial court required the plaintiff to elect between the fraud and VCPA claims. (*Id.* at p. 560.)

The plaintiff conceded that he could not recover compensatory damages on both claims. He also conceded that he could not recover both the treble damages and the punitive damages. He argued, however, that he was entitled to recover the $4,000 in compensatory damages (on the VCPA claim), the $100,000 in punitive damages (on the fraud claim), and the $34,183 in attorney's fees and costs (on the VCPA claim). (*Wilkins*, *supra*, 266 Va. at p. 562.)

The Virginia Supreme Court agreed. (*Wilkins*, *supra*, 266 Va. at pp. 562-563.) It observed, "The genus of election of remedies has many species. This case is not about claims that are irreconcilable, such as a claim for rescission of the contract accompanied by a claim for specific performance. Nor does this issue involve questions of election between remedies at law or in equity." (*Id.* at pp. 560-561.) It noted that the VCPA

64

provided for an award of attorney fees "'Notwithstanding any other provision of law to the contrary . . . .'" (*Id.* at p. 562.)[13] "Additionally, the purpose of the attorney's fees and costs provision is different from the purpose of punitive damages. Punitive damages are designed to punish offensive or unlawful conduct and deter it in the future. [Citation.] The fee shifting provisions of the VCPA are designed to encourage private enforcement of the provisions of the statute." (*Id*. at p. 563; see also *Driskell v. Summit Contracting Group, Inc.* (4th Cir. 2020) 828 Fed.Appx. 858, 871-872; *Garcia v. Coffman* (N.M. Ct. App. 1997) 124 N.M. 12, 21-22, cert. den. 123 N.M. 626; *United Laboratories, Inc. v. Kuykendall* (1993) 335 N.C. 183, 189-194 and cases cited.)

We do not mean to say that the decisions on this issue are totally unanimous. (See *Grogan v. Garner* (8th Cir. 1986) 806 F.2d 829, 839.) However, the weight of authority is behind *Miller* and *Wilkins*; moreover, we find them persuasive.

Ford cites *Fineman v. Armstrong World Industries, Inc.* (3d Cir. 1992) 980 F.2d 171 (*Fineman*), in which a jury awarded one of the plaintiffs $19.5 million in treble damages on its antitrust claim, and $17.7 million in compensatory damages, plus $200 million in punitive damages, on its tortious interference claim. (*Id*. at pp. 182, 218.) The appellate court held that the plaintiff could be required to elect between the two awards. (*Id.* at p. 219.) It explained that the treble damages were essentially punitive and therefore overlapped the punitive damages. (*Ibid*.)

---

[13] Here, similarly, the Song-Beverly Act provides, "The remedies provided by this chapter are cumulative and shall not be construed as restricting any remedy that is otherwise available . . . ." (Civ. Code, § 1790.4.)

We accept that a plaintiff cannot recover both a statutory penalty and punitive damages based on the same conduct. (See part VIII, *post*.) The present question, however, is whether a plaintiff can recover compensatory damages on one claim and punitive damages on a different claim. That issue simply was not presented in *Fineman*. As the treble damages were $19.5 million, evidently the compensatory damages on the antitrust claim were $6.5 million; the compensatory damages on the state-law claim were $17.7 million. Thus, the plaintiff had no incentive to try to combine compensatory damages on the antitrust claim with punitive damages on the state-law claim.

Ford also cites *Quest Medical, Inc. v. Apprill* (5th Cir. 1996) 90 F.3d 1080, which was decided under Texas law. (*See id*. at pp. 1089-1090, 1093.) In Texas, however, attorney fees may be awarded as an element of punitive damages. (*Canales v. Zapatero* (Tex. App. 1989) 773 S.W.2d 659, 660; *Carter v. Barclay* (Tex. Civ. App. 1972) 476 S.W.2d 909, 917.) Hence, an award of both attorney fees and punitive damages can constitute a double recovery. (*JHC Ventures, L.P. v. Fast Trucking, Inc.* (Tex. App. 2002) 94 S.W.3d 762, 774-776, disapproved on other grounds in *Medical City Dallas, Ltd. v. Carlisle Corp.* (Tex. 2008) 251 S.W.3d 55, 62.) That is not the law in California.

Ford also cites *Celeritas Technologies, Ltd. v. Rockwell Intern. Corp.* (Fed. Cir. 1998) 150 F.3d 1354, cert. den. (1999) 525 U.S. 1106. There, however, the plaintiff had stipulated before trial that, "to simplify the trial and avoid a duplicative recovery," it would accept the award on either its breach of contract, misappropriation of trade secrets, or patent infringement theory, whichever was highest. (*Id*. at p. 1357.) The appellate

court held that, because of its stipulation, the plaintiff could not recover both the compensatory damages awarded for breach of contract and the punitive damages awarded for misappropriation. (*Id*. at p. 1362.) The Bowsers entered no such stipulation.

We therefore conclude that the Bowsers are entitled to compensatory damages (and attorney fees) under the Song-Beverly Act as well as punitive damages for fraud.

VIII

RECOVERY OF BOTH A STATUTORY PENALTY AND PUNITIVE DAMAGES

Ford contends that the Bowsers cannot recover both a statutory penalty under the Song-Beverly Act and punitive damages on their fraud claims.

A.     *Additional Factual and Procedural Background*.

Ford filed objections to the Bowsers' proposed judgment. Although the objections themselves are not in the record, apparently Ford argued, among other things, that the Bowsers could not recover both a statutory penalty under the Song-Beverly Act and punitive damages.

The trial court overruled the objection. It explained that the fraud claims were based on "what happened prior to the purchase of the vehicle," whereas the Song-Beverly claim was based on Ford's failure to repurchase the vehicle.

Ford raised the same argument again in its motion for JNOV. The trial judge denied the motion. Again, it explained that "the conduct complained of by Plaintiffs for fraud occurred *prior* to the acquisition of the vehicle; the Song-Beverly penalty occurred *after*."

67

B.    *Discussion.*

The Song-Beverly Act provides that, for a willful violation, in addition to actual damages, a buyer may recover "a civil penalty which shall not exceed two times the amount of actual damages . . . ."  (Civ. Code, § 1794, subd. (c).)  It further provides: "The remedies provided by this chapter are cumulative and shall not be construed as restricting any remedy that is otherwise available . . . ."  (Civ. Code, § 1790.4.)

"[I]f a defendant is liable for a statutory penalty . . . , the award is punitive in nature, and the award penalizes essentially the same conduct as an award of punitive damages.  The plaintiff cannot recover punitive damages in addition to that recovery but must elect its remedy.  [Citations.]  . . .  We presume that the Legislature did not intend to allow such a double recovery absent a specific indication to the contrary.  [Citations.]"  (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 759-760.)

The source of this rule — and the rule against a double recovery in general — is not entirely clear.  *Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218 (*Troensegaard*) "note[d]" the statement in a lower federal court case that overlapping punitive damages awards violate due process.  (*Id.* at p. 227, citing *In re Northern Dist. of California Dalkon Shield IUD Products Liability Litigation* (N.D. Cal. 1981) 526 F.Supp. 887, 899, vacated on other grounds in *Abed v. A.H. Robins Co.* (9th Cir. 1982) 693 F.2d 847; see also *In re Federal Skywalk Cases* (8th Cir. 1982) 680 F.2d 1175, 1188 ["Unlimited multiple punishment for the same act determined in a succession of

68

individual lawsuits and bearing no relation to the defendants' culpability or the actual injuries suffered by victims, would violate the sense of 'fundamental fairness' that is essential to constitutional due process."], cert. den. sub nom. *Stover v. Rau* (1982) 459 U.S. 988.) *Troensegaard*, however, went on to say: "We are of the opinion that had the Legislature . . . intended a double recovery of punitive and penal damages for the same willful, oppressive, malicious, and oppressive acts, it would in some appropriate manner have said so." (*Id*. at p. 228.) This implies that there is no absolute due process bar to a double recovery, so long as that is what the Legislature intended. (See also *Shore v. Gurnett* (2004) 122 Cal.App.4th 166, 176 [imposing criminal penalty and punitive damages for same conduct does not violate due process].)

Because the question is close, we assume, without deciding, that overlapping punitive damages awards do violate due process. On that assumption, it is irrelevant that the Song-Beverly Act states that the remedies it provides are cumulative; regardless of its wording, and regardless of the legislative intent, "a statutory penalty [that] penalizes essentially the same conduct as an award of punitive damages" (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles*, *supra*, 152 Cal.App.4th at pp. 759-760) is unconstitutional.

A statutory penalty under the Song-Beverly Act "is imposed as punishment or deterrence of the defendant, rather than to compensate the plaintiff," and therefore "is akin to punitive damages. [Citation.]" (*Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 184.) The key question is whether the statutory penalty and

69

the award of punitive damages "penalize[] essentially the same conduct . . . ."  (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles*, *supra*, 152 Cal.App.4th at pp. 759-760.)

First, we discuss what "the same conduct" means in this context; second, we discuss whether the two awards here were based on "the same conduct," as thus defined.

1. *The Legal Standard for Whether Two Awards of Punitive Damages "Penalize*[] *Essentially the Same Conduct*."

"The same conduct," on its face, seems pretty clear.  It means the conduct giving rise to liability for punitive damages — i.e., the conduct being penalized.  This is the conduct that satisfies the elements of the cause of action, and that must be accompanied by malice, oppression, or fraud.

That was the situation in *Clauson v. Superior Court* (1998) 67 Cal.App.4th 1253.  There, the plaintiffs asserted causes of action for invasion of privacy and for violation of Penal Code section 673.2, subdivision (a), both based on the defendants' conduct of wiretapping one plaintiff's phone and thus eavesdropping on conversations between him and the other plaintiffs.  (*Clauson v. Superior Court*, *supra*, at p. 1255.)  The appellate court held that, if the plaintiffs prevailed, they would have to elect between punitive damages on the invasion of privacy claim or a statutory penalty under the Penal Code section.  (*Clauson v. Superior Court, supra,* at p. 1256.)

Likewise, in *Marshall v. Brown* (1983) 141 Cal.App.3d 408, the plaintiff asserted causes of action for slander and for misrepresentation preventing employment in

70

violation of Labor Code section 1050, both based on a letter the defendants had sent. (*Marshall v. Brown*, *supra*, at pp. 411-412.)  The appellate court held that the plaintiff would have to elect between punitive damages on the slander claim and a statutory penalty under the Labor Code claim.  (*Marshall v. Brown, supra*, at p. 419.)

Ford argues that "the same conduct" means the defendant's entire "unified course of conduct, . . . even when multiple and distinct acts, giving rise to claims under different legal theories, are involved."  It cites *In re Northern Dist. of California Dalkon Shield IUD Products Liability Litigation*, *supra*, 526 F.Supp. 887 (*Dalkon*).  *Dalkon* said, "Common sense dictates that a defendant should not be subjected to multiple civil punishment for a single act *or unified course of conduct* which causes injury to multiple plaintiffs."  (*Id*. at p. 900, italics added.)  However, it also said, "A defendant has a due process right to be protected against unlimited multiple punishment for *the same act*."  (*Id*. at p. 899, italics added.)

More to the point, in *Dalkon*, there was simply no issue as to the *scope* of the bar on overlapping punitive damages.  The court mentioned it only because, in the case before it, it was a factor in favor of certifying a class, as that would prevent overlapping awards.  (*Dalkon, supra*, 526 F.Supp at pp. 898-900.)  Once again, cases are not authority for propositions that are not considered.  (*B.B. v. County of Los Angeles*, *supra*, 10 Cal.5th at p. 11.)

Ford also cites *Troensegaard*, *supra*, 175 Cal.App.3d 218.  In *Troensegaard*, the plaintiff bought a motorhome manufactured by the defendant; the motorhome was

defective because it gave off formaldehyde fumes.  (*Id*. at pp. 223-224.)  The defendant

had an engineering company examine the motorhome but refused to release the resulting

report to the plaintiff.  (*Id*. at p. 224.)  She sued for products liability, fraudulent

concealment, and for violation of the Song-Beverly Act.  (*Id*. at pp. 220-221, 226.)

The appellate court upheld an award of punitive damages because "intentional

concealment from plaintiff of the high level of formaldehyde fumes found in the mobile

home, and its failure substantially to comply with its express warranty by taking

appropriate corrective action or otherwise making Mrs. Troensegaard whole, was

reasonably found by the jury to constitute 'oppression, fraud, or malice' with a

'conscious disregard of the plaintiff's rights.'"  (*Troensegaard*, *supra*, 175 Cal.App.3d at

p. 226.)

It also held, however, that the plaintiff could not recover both punitive damages

and a statutory penalty under the Song-Beverly Act.  (*Troensegaard*, *supra*, 175

Cal.App.3d at pp. 226-228.)  It said, "Each of the awards was based upon substantially

the same conduct of [the defendant]."  (*Id*. at p. 226.)

One justice dissented, in part.  As he saw it, "the punitive damages award was

based not on the same conduct evidencing wilful noncompliance but on the separate and

distinct theory of fraudulent concealment of the unfavorable . . . report; and the jury so

specially found.  That special finding, adequately supported by the evidence,

independently justified an award of punitive damages under Civil Code section 3294.

Each award rests on a separate factual basis and legal theory involving more than a single

kind of actionable conduct entitled to be redressed in damages." (*Troensegaard*, *supra*, 175 Cal.App.3d at p. 230 [dis. opn. of Racanelli, P. J.].)

According to Ford, *Troensegaard* means that the bar to overlapping punitive damages applies to its whole course of conduct, as shown by the evidence. It claims that, by rejecting the dissenting justice's view, the *Troensegaard* majority essentially also rejected the Bowsers' position that the two awards here are based on separate and distinct conduct.

That is not how we read *Troensegaard*. In the view of the majority, the punitive damages award was based on *both* the fraudulent concealment claim and the Song-Beverly claim; therefore, it was based on the same conduct as the Song-Beverly statutory penalty. In the view of the dissent, it was based *only* on the fraudulent concealment claim, and therefore on different conduct. Without the record in *Troensegaard*, it is hard to say who had the better of this argument. We can say, however, that both views focused — as we do — on the conduct that gave rise to the punitive damages.[14]

---

[14] The dissent is laconic. Its statement that the punitive damages award was not based on the "conduct evidencing willful noncompliance" seems to mean that it was not based on the Song-Beverly claim at all.

It is possible, however, that the dissenting justice was saying (in an awkward way) that, as long as the punitive damages award was based on *both* the fraudulent concealment and Song-Beverly claims, it could be deemed to be based on the former, and hence to be based on different conduct from the latter.

If so, we would agree with the dissent, and not with the majority. If a punitive damages award on the Song-Beverly claim had to be struck down as duplicative, a punitive damages award on the fraudulent concealment claim could still stand.

Ford also argues, alternatively, that a statutory penalty and punitive damages are "based on the same conduct" if they arise out of the violation of a single "primary right." It cites two cases that referred to a statutory penalty and punitive damages arising out of "the same cause of action." (*Los Angeles County Metropolitan Transportation Authority v. Superior Court* (2004) 123 Cal.App.4th 261, 268 (*Los Angeles*); *Marshall v. Brown*, *supra*, 141 Cal.App.3d at p. 418 (*Marshall*).)

There are several problems with this. First, the references in both *Los Angeles* and *Marshall* were in passing. They were not intended to define the scope of the rule against overlapping punitive damages. Yet again, cases are not authority for propositions that are not considered. (*B.B. v. County of Los Angeles*, *supra*, 10 Cal.5th at p. 11.)

Second, "cause of action" is a notoriously slippery term. It may refer to each count of a complaint, stating a distinct legal theory. It may also refer to each distinct harm or injury asserted by the plaintiff. (See generally *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 798.) When used in the latter sense, "[u]nder the 'primary rights' theory, a cause of action arises from the invasion of a primary right." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 818, fn. 1.) The "primary right" definition of a cause of action is significant primarily in the field of res judicata. (*Boeken v. Philip Morris USA, Inc.*, *supra*, at p. 798.) It is not clear in which sense *Los Angeles* and *Marshall* were using the term, but it seems most likely to have been in the pleading sense.

It would make no sense to state the rule against overlapping punitive damages in terms of the plaintiff's "primary right." In applying the rule against overlapping

74

*compensatory* damages, the focus is on the harm to the plaintiff. "'The primary object of an award of damages in a civil action . . . is just compensation or indemnity for the loss or injury sustained by complainant, *and no more*.' [Citations.]" (*Estate of De Laveaga* (1958) 50 Cal.2d 480, 488, italics added.) However, in applying the rule against overlapping *punitive* damages, the focus is on the harmful conduct of the defendant. The punitive damages should be sufficient to deter such conduct, *but no greater*. If the defendant harms the plaintiff by lying about a defective truck, and if thereafter it also harms the plaintiff by failing to fix the defective truck, a jury can fairly decide that double deterrence is necessary.

As contrary authority, Ford cites *Holmberg v. Morrisette* (8th Cir. 1986) 800 F.2d 205, cert. den. (1987) 481 U.S. 1028. There, the defendants wrongfully drew down a letter of credit issued by plaintiff Holmberg by submitting false and misleading documents. (*Id*. at pp. 207-208.) The plaintiff sued the defendants for, among other things, fraud and conversion. (*Id*. at p. 208.) The appellate court, applying Minnesota law (see *id*. at p. 211), said: "[A] recovery of compensatory damages on both the fraud and conversion claims clearly would be duplicative and should not be allowed. Holmberg has suffered only one injury — the wrongful drawing down of his letter of credit — and is entitled to be compensated for that injury only once. Similar reasoning applies to the question of punitive damages on both the fraud and conversion claims. Fraud and conversion are separate legal theories of liability, but in reality defendants have injured Holmberg only once. Accordingly, they are to be punished only once, not as

75

many times as there are separate legal theories that have been found to fit the case." (*Id.* at p. 212.)

We agree with the result in *Holmberg*. The punitive damages, whether for fraud or conversion, arose from a single act by the defendants — drawing down the letter of credit. However, we do not agree with *Holmberg*'s focus on the injury to Holmberg rather than on the conduct of the defendants.

In a subsidiary argument, Ford argues that the Song-Beverly Act penalty statute (Civ. Code, § 1794, subd. (c)) is specific, whereas the general punitive damages statute (Civ. Code, § 3294) is general; they invoke the rule that "'a more specific statute controls over a more general one.' [Citations.]" (*Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 992.)

"Whether a special statute supplants a general statute is primarily a question of legislative intent. [Citations.]" (*Lyons v. Municipal Court* (1977) 75 Cal.App.3d 829, 838-839.) Thus, it does not apply when "an intent to the contrary clearly appears. [Citation.]" (*Warne v. Harkness* (1963) 60 Cal.2d 579, 588.) Here, as mentioned, the Song-Beverly Act expressly provides that "[t]he remedies provided by this chapter are cumulative and shall not be construed as restricting any remedy that is otherwise available . . . ." (Civ. Code, § 1790.4.) Thus, it affirmatively manifests a legislative intent *not* to supplant punitive damages.

## 2. *The Application of the Legal Standard to This Case.*

The Bowsers were consistently *inconsistent* about whether their fraud causes of action were based solely on pre-sale conduct.

The operative complaint alleged that Ford committed fraud both before and after the sale. Before the sale, it alleged, Ford failed to disclose the problems with the 6.0L engine and made false representations in written promotional materials. The selling dealership also represented that the problems with the engine had been fixed. The Bowsers relied by buying the truck.

However, it also alleged that after the sale, Ford concealed its inability to repair the defects in the engine. It adopted a policy of making only "Band-Aid" repairs, which concealed the defects of the engine until after the warranty expired. Ford also made false promises that the truck had been "fixed." The Bowsers allegedly relied (in an unspecified manner) on Ford's representations and nondisclosures.

Despite these allegations, the two fraud causes of action specifically stated: "Plaintiffs' fraud-based claims arise from the . . . factual circumstances, by which Ford induced plaintiffs to enter into a Retail Installment Sales Contract . . . ." The only reliance specifically alleged *in these causes of action* was that the Bowsers bought the truck.

In opening statement, the Bowsers' counsel said, "The case is not just about fraud and concealment from Ford to get them to buy this truck in the first place, but it is about an ongoing pattern [and] practice, a continued failure to disclose information that Ford

77

knew. Repeatedly when the Bowsers would come in, . . . Ford had the opportunity . . . to tell them what Ford actually knew about all the problems that really couldn't be fixed, and the evidence is going to show they never did that."

"Ford misrepresented and it concealed information from consumers like Mr. and Mrs. Bowser regarding . . . problems that reasonable consumers would want to know in deciding whether or not they wanted to purchase a vehicle *and problems that they'd want to know about when determining whether or not, when their vehicle was failing, . . . if was any real repair strategy for the problems they were encountering.*" (Italics added.)

In closing argument, the Bowsers' counsel argued that Ford never disclosed the defects of the 6.0L engine, as shown by the internal Ford documents; he did not distinguish between those dated before and after the sale. Thus, he said, "Ford consistently from 2002 *through to 2007* internally discussed all of the things that it knew about problems with the 6.0 liter diesel engine that it never disclosed to people like the Bowsers . . . ." (Italics added.) "They were never told what Ford knew, and *over time they were never told what Ford continued to know as they repeatedly brought their truck in for repair after repair.*" (Italics added.)

He argued repeatedly that the Bowsers relied by buying the truck. However he also argued, "Had they ever been told the truth, they would have demanded a buyback."

Nevertheless, he also said, "This case has nothing to do with Ford's efforts after the fact to fix the truck. Everything that this case involves is Ford's non-disclosure and misrepresentation of information before the time the Bowsers got the truck."

The jury was instructed that, for Ford to be liable for fraud, the Bowsers had to have reasonably relied on Ford's false representation or nondisclosure. (CACI Nos. 1900, 1901, 1908.) It was also instructed that: "Plaintiffs Ralph and Heidi Bowser relied on Defendant Ford Motor Company's misrepresentation or concealment if:

"1. The misrepresentation or concealment substantially influenced them to acquire the 2006 Ford F-250 Super Duty [t]ruck; and

"2. Plaintiffs would probably not have acquired the 2006 Ford F-250 Super Duty [t]ruck without the misrepresentation or concealment."

Finally, the jury was also instructed that, to be liable under the Song-Beverly Act, Ford had to have "failed to repair the vehicle to match the written warranty after a reasonable number of opportunities to do so," and thereafter failed to "promptly replace or buy back the vehicle." (CACI No. 3201.)

In sum, then, the Bowsers waffled from the very beginning to the very end of the case as to whether their fraud claims were based, at least in part, on Ford's post-sale conduct. The instruction on reliance, however, provided that the jury could find Ford liable for fraud *only* if the fraud induced the *purchase* of the truck. Thus, it required the jury to look exclusively at Ford's pre-sale conduct. "Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed' [citation]." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804.)

79

The jury's verdict confirms that, in deciding the fraud claims, it did look exclusively at Ford's pre-sale conduct. On those claims, it awarded Ford $43,084.68 — the exact purchase price of the truck. Thus, even assuming it found that Ford's fraudulent conduct continued after the sale, it also found that the Bowsers did not rely on the post-sale fraud and/or did not incur any damages as a result of their reliance.

Ford argues that the Bowsers relied on internal Ford documents that were dated both before and after the sale. However, post-sale *evidence* could be relevant to pre-sale *conduct* (and vice versa). For example, to show that Ford's pre-sale representations were false, the Bowsers were entitled to show that Ford and/or the truck ultimately did not live up to them post-sale.

As another example, Exhibit 62, a post-sale email from Koszewnik, said that the 6.0L engine had a 15-newton EGR valve rather than a 200-newton EGR valve, which was the "industry standard." This was relevant to whether the 6.0L engine was defective and to whether Ford knew — even pre-sale — that it was defective.

In any event, even assuming that the Bowsers urged the jury to rely on these documents as supporting their fraud claims, the instructions show that the jury did not.

Thus, as the trial court ruled, Ford's liability for fraud — including its liability for punitive damages — was based on its acts prior to the sale. By contrast, its liability under the Song-Beverly Act — including its liability for a civil penalty — was based on its acts after the sale.

### 3. *Anderson*.

*Anderson v. Ford Motor Co.* (2022) 74 Cal.App.5th 946 (*Anderson*), pet. for rev. filed Mar. 21, 2022, supports our conclusions. Anderson was yet another case against Ford arising out of alleged defects in the 6.0L engine. (*Id*. at pp. 950-959.) There, as here, Ford argued that the plaintiffs could not recover both a statutory penalty under the Song-Beverly Act and punitive damages. (*Id*. at pp. 962-963.) The appellate court disagreed because "the punitive damages and statutory penalties were based on different conduct that took place at different times. The punitive damages were based on conduct underlying the fraud . . . cause[] of action and took place before the sale. The civil penalty was based on defendant's post-sale failure to comply with its Song-Beverly Act obligations to replace the vehicle or make restitution when reasonable attempts to repair had failed." (*Id*. at p. 966; see also *id*. at p. 971.)

It rejected Ford's argument that "the same conduct" should be defined in terms of the plaintiffs' primary right. (*Anderson*, *supra*, 7 Cal.App.5th at pp. 968-969.) "'The primary right theory has a fairly narrow field of application'" — namely the field of res judicata. (*Id*. at p. 969.) "'[T]he primary right must also be distinguished from the remedy sought . . . . '[M]ultiple remedies may be available to vindicate a single primary right.' [Citation.]" (*Ibid*.) Rather, "the appropriate inquiry should be focused on the underlying conduct." (*Anderson*, *supra*, at p. 965.) "[T]he recovery of both punitive damages and civil penalties is prohibited when the underlying conduct for both remedies *is the same conduct, i.e., identical conduct*." (*Id*. at pp. 970-971.)

Finally, it also rejected Ford's argument that the plaintiffs had relied on the same evidence to prove "a pattern and practice of misconduct" constituting both fraud and a Song-Beverly violation.  (*Anderson*, *supra*, 7 Cal.App.5th at pp. 970-973.)  "To be sure, the corporate communications were probative of Ford's culpability for its pre-sale conduct, the level of reprehensibility of that conduct, and the amount of punitive damages to be imposed.  But the fact some of those communications may have also been probative of the willfulness of Ford's Song-Beverly Act noncompliance does not bar plaintiffs from both an award of punitive damages and civil penalties.  [Citation.]"  (*Id.* at p. 971.)  "Ford simply cannot escape liability for both awards by virtue of the fact that it engaged in a pattern or practice of deceitful misconduct throughout the course of the discrete events and conduct involved here."  (*Id.* at p. 973.)

In short, *Anderson* is dispositive of Ford's present contention.  Nevertheless, because the opinion in *Anderson* is not yet final, we have analyzed the contention independently, and we have come to the same conclusions as *Anderson*.

For these reasons, we conclude that the statutory penalty and the punitive damages did not punish the same conduct.

IX

DISPOSITION

The judgment is affirmed.  The Bowsers are awarded costs on appeal against Ford.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
                                                                            P. J.


We concur:

McKINSTER
                        J.

MILLER
                        J.